USCA1 Opinion

 

 United States Court of Appeals United States Court of Appeals For the First Circuit For the First Circuit ____________________ No. 94-1767 RHODE ISLAND DEPOSITORS ECONOMIC PROTECTION CORP., ET AL., Plaintiffs, Appellees, v. JOHN A. HAYES AND IOLA HAYES, Defendants, Appellants, v. STEVEN M. MCINNIS, ET AL., Defendants, Appellees, No. 94-1768 RHODE ISLAND DEPOSITORS ECONOMIC PROTECTION CORP., ET AL., Plaintiffs, Appellees, v. ROBERT P. MCGOLDRICK, Defendant, Appellant, v. STEVEN M. MCINNIS, ET AL., Defendants, Appellees. ____________________ APPEALS FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MASSACHUSETTS [Hon. Rya W. Zobel, U.S. District Judge] ___________________ ____________________ Before Torruella, Chief Judge, ___________ Boudin and Stahl, Circuit Judges. ______________ ____________________ Mark A. Stull with whom Dennis F. Gorman and Fletcher, Tilton & _____________ _________________ ___________________ Whipple, P.C. were on brief for appellants. _____________ Allen N. David with whom Harvey Weiner, Maureen Mulligan, and ________________ ______________ _________________ Peabody & Arnold were on brief for appellees. ________________ ____________________ September 7, 1995 ____________________ STAHL, Circuit Judge. Limited partners who STAHL, Circuit Judge. ______________ personally guaranteed the partnership's obligations to a credit union seek indemnification on their guaranty, as well as damages, from the attorney (and his law firm) representing the partnership. The district court entered summary judgment for the attorneys. We now affirm.  I. I. __ FACTUAL BACKGROUND AND PRIOR PROCEEDINGS FACTUAL BACKGROUND AND PRIOR PROCEEDINGS ________________________________________ During the heady late eighties, Carol Lavin, a Jamestown, Rhode Island real estate agent, conceived a plan to purchase and develop luxury homes on an eighty-acre tract of land located in Jamestown. Lavin, a novice at real estate development, enlisted her husband Kevin Lavin, her sister Janice Barron, and her brother-in-law James Barron in the project. The new venturers were equally unknowledgeable in the nuances of real estate development.  Lavin approached the parcel's owners, David Henderson and Donald Huggins ("sellers"), who indicated a willingness to sell their land for $2.7 million. Although the price seemed high, the Lavins and Barrons remained interested. However, to make the deal work, they needed more capital than they had. In order to remedy this deficiency, Carol Lavin and Janice Barron contacted dozens of potential investors, including appellants John and Iola Hayes and Robert McGoldrick. During the summer of 1987, the Lavins and -3- 3 Barrons met with the Hayeses and McGoldrick on several occasions to discuss the project. A rosy financial projection of the completed development forecast a $2 million profit for the venturers. Eventually, the Hayeses and McGoldrick, with a vision of high returns, agreed to invest in the scheme. Like the Lavins and Barrons, the three investors had no prior experience in real estate development. On September 14, 1987, Carol Lavin, Janice Barron, and John Hayes met with appellee Steven McInnis, a Rhode Island attorney, about legal representation for the project ("September 14 meeting"). The participants discussed the project's form and financing. McInnis was advised that the Hayeses and McGoldrick wished to limit their investment to a total of $200,000 (based on a $100,000 investment by the Hayeses and a $100,000 investment by McGoldrick). McInnis suggested that rather than a general partnership they form a limited partnership, with the Hayeses and McGoldrick as the limited partners and the Lavins and Barrons as the general partners. McInnis indicated that the prospective limited partners (that is, the Hayeses and McGoldrick), might want to retain their own attorneys to represent their interests. McInnis agreed to draft the partnership agreement and to represent the limited partnership, later named Cedar Hill Developments, L.P. ("the partnership"). -4- 4 Sometime after the September 14 meeting, the Hayeses and McGoldrick (hereinafter, "limited partners") and the Lavins and Barrons (hereinafter, "general partners") discussed whether they should retain separate counsel, as suggested by McInnis. By deposition, general partner Lavin testified, "we all decided as a group to let [McInnis] represent us," and she later communicated this decision to McInnis. In his pretrial deposition, McInnis testified that "they [the general and limited partners] indicated that they wished me to perform certain tasks on behalf of the `group,' . . . but it was phrased more in the context of performing certain, in their view, relatively routine tasks required by either the bank or the buyers and the seller." McInnis denies ever agreeing to represent the limited partners individually. Throughout the course of the representation, all attorneys fees were billed to the partnership and paid by partnership funds. The parties to the transaction eventually hammered out the details of the transaction. Of the $2.7 million sale price, $300,000 was to be in cash, $900,000 was to be financed by the sellers (secured by a second mortgage on the parcel), and $1.5 million was to be financed through a bank loan. In addition, the sellers were each to receive a 12.5% limited partnership interest.  -5- 5 Meanwhile, Carol Lavin attempted to secure bank financing. The going proved difficult. Three institutions, including the Marquette Credit Union ("Marquette"), turned down the group's loan application. Later, Marquette reversed its position and agreed to loan up to $3.5 million for the purchase and development of the land. However, as a condition for the loan, Marquette required a personal guaranty from the Lavins, the Barrons, the Hayeses, and McGoldrick. The Marquette commitment letter, dated November 6, 1987, stated that the limited partners would have to guaranty the loan personally in the event of a partnership default. At some point during November 1987, Carol Lavin informed McInnis of Marquette's guaranty requirement. McInnis, however, did not participate in the negotiations with Marquette, and at no point did any of the partners request his participation. Marquette prepared the guaranty. On December 11, 1987, the general and limited partners convened at McInnis's office to sign documents effecting the formation of the partnership and executing bank documents including the guaranty. There is conflicting evidence in the record as to whether the limited partners knew of the personal guaranty requirement prior to the December 11 meeting, although all three appear to have signed -6- 6 the commitment letter.1 In any event, at this meeting, McGoldrick clearly evidenced his understanding of the nature of his obligation, for he explicitly stated that he knew that he was making himself personally liable for the entire loan in the event of a default. For their part, the Hayeses recall nothing about the meeting or the commitment letter, although they acknowledge their signatures appear on the guaranty agreement. At no time, either prior to signing the commitment letter or prior to signing the guaranty itself, did any of the partners request McInnis to intervene with Marquette to seek removal or modification of the guaranty. Closing on the sale occurred on December 15, 1987. The development quickly floundered. Ultimately, only three homes were ever sold. By August 1988, the Hayeses had retained separate counsel. At that time, they demanded, futilely, a return of their capital contribution and "a release from all Limited Partnership obligations." By January 1989, the partnership defaulted with more than $2 million outstanding. Marquette failed in early 1991. Its receiver held a foreclosure sale on April 17, 1991, at which it purchased the development for $850,000. The receiver and its successor, Rhode Island Depositors Economic Protection Corporation ("DEPCO"), sued on  ____________________ 1. The Hayeses now state that they are uncertain about whether their signatures appear on the commitment letter. -7- 7 the guaranty to recover $2,004,446, plus interest and late charges. The limited partners, in turn, instituted third- party claims against McInnis and his law firm, Cameron & Mittleman (collectively, "attorneys"), seeking indemnification and damages. The district court granted the summary judgment motions of both DEPCO and the attorneys against the limited partners. This appeal ensued. However, because of a prior settlement with DEPCO, only the third party claims are now on appeal. II. II. ___ DISCUSSION DISCUSSION __________ The limited partners raise two principal issues on appeal: first, whether they are entitled to indemnification by the attorneys for the amount owed to DEPCO, plus costs and attorneys fees; and second, whether they are entitled to damages against the attorneys under theories of malpractice, breach of contract, and misrepresentation. After reciting the standard of review, we discuss each argument in turn. A. Standard of Review ______________________ Summary judgment is appropriate when the record reflects "no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). We review a grant of summary judgment de novo. See, e.g., Colonial Courts Apartment Co. __ ____ ___ ____ _____________________________ v. Proc Assocs., 57 F.3d 119, 122 (1st Cir. 1995). We review ____________ -8- 8 the record in the light most favorable to the nonmoving party, and indulge all reasonable inferences in that party's favor. Id. ___ B. Indemnification Claim _________________________ The limited partners argue that the attorneys must indemnify them because of negligence on the part of McInnis and because of alleged violation of Massachusetts securities laws. We find indemnification inapposite in this context.  We begin with general principles.2 "The concept of indemnity is based upon the theory that one who has been exposed to liability solely as the result of a wrongful act of another should be able to recover from that party." Muldowney v. Weatherking Prods., Inc., 509 A.2d 441, 443 _________ __________________________ (R.I. 1986) (citation omitted). Thus, one party may seek full reimbursement from another when he has fully discharged a common, as opposed to "joint," liability. W. Page Keeton, et al., Prosser and Keeton on the Law of Torts 51 (5th ed. ______________________________________ 1984) (hereinafter, "Prosser & Keeton"). Stated another way, "[i]f another person has been compelled to pay damages that should have been paid by the wrongdoer, the latter becomes liable to the former." Muldowney, 509 A.2d at 443.  _________ The Rhode Island Supreme Court has made clear that an indemnification cause of action lies in two situations:  ____________________ 2. The parties do not dispute that the substantive law of Rhode Island applies. -9- 9 first, when there is an express contractual provision creating a right of indemnity;3 and, second, when equitable principles give rise to a right to indemnification. Less clear is the status of a third theory, that of implied contractual indemnification. Although courts have assumed that an implied contractual indemnification cause of action exists, see, e.g., A & B. Constr., Inc. v. Atlas Roofing & ___ ____ ______________________ ________________ Skylight Co., 867 F. Supp. 100, 107 (D.R.I. 1994); Roy v. ____________ ___ Star Chopper Co., 442 F. Supp. 1010, 1019 (D.R.I. 1977), _________________ aff'd, 584 F.2d 1124 (1st Cir. 1978), cert. denied, 440 U.S. _____ _____ ______ 916 (1979), the Rhode Island Supreme Court has never explicitly so held. For our purposes, we will assume that it does.  Rhode Island courts will allow indemnity on an equitable theory when three conditions obtain: First, the party seeking indemnity must be liable to a third party. Second, the prospective indemnitor must also be liable to the third party. Third, as between the prospective indemnitee and indemnitor, the obligation ought to be discharged by the indemnitor. Muldowney, 509 A.2d at 443-44. The limited partners' claim _________ fails on the second and third prongs. We know of no cause of action under which DEPCO would be able to proceed against the attorneys, a point which the limited partners essentially concede in their brief. By implication, therefore, the  ____________________ 3. No such agreement exists in this case. -10- 10 limited partners' claim also fails on the third prong. "`The purpose of an indemnity action is to require the party primarily liable to hold harmless the party secondarily liable.'" Id. at 444 (quoting Helgerson v. Mammoth Mart, ___ _________ _____________ Inc., 335 A.2d 339, 341 (R.I. 1975)). Even assuming the ____ attorneys were negligent or disregarded securities laws, that does nothing to absolve the limited partners of their primary liability on the guaranty.  For similar reasons, the limited partners' implied contractual indemnification claim also fails. "[A] contractual right to indemnification will only be implied when there are unique special factors demonstrating that the parties intended that the would-be indemnitor bear the ultimate responsibility . . . or when there is a generally recognized special relationship between the parties." Araujo ______ v. Woods Hole, Martha's Vineyard, Nantucket S.S. Auth., 693 _____________________________________________________ F.2d 1, 2 (1st Cir. 1982) (citing Roy, 442 F. Supp. at 1019) ___ (other citation omitted). The limited partners fail to point to anything in the record demonstrating the parties intended that the attorneys would bear ultimate responsibility for the guaranty. Further, even assuming a separate attorney-client relationship existed between the limited partners and the attorneys, that is not the kind of "generally recognized special relationship" that gives rise to an implied indemnitee-indemnitor relationship. Cf. Prosser & Keeton  ___ -11- 11 51 (special relationships include, inter alia, employer's _____ ____ vicarious liability for the tort of a servant; an independent contractor, or an innocent partner, or a carrier held liable for the acts of another; an automobile owner held liable for the conduct of the driver). While we do not foreclose the possibility that an intent to indemnify could possibly exist in the attorney-client context, there is simply no evidence supporting such a conclusion here.4 To sum up, because there was no express agreement to indemnify, and because the record does not support either of the other theories of indemnification, we conclude that the district court properly granted summary judgment as to this claim. C. Damages Claims __________________ The limited partners also asserted claims and sought damages for professional negligence, breach of contract, and misrepresentation. The district court  ____________________ 4. The limited partners argue that a claim of indemnification lies whenever a putative indemnitor fails to perform his "contractual obligations in a workmanlike manner." Without regard to whether the limited partners state a correct principle of law, their argument is without force because, as we discuss fully below, there was no contractual relationship between the limited partners and the attorneys. Nor do we agree with the limited partners that they acceded to enforceable rights as third-party beneficiaries of the contract between the attorneys and the partnership. We detect no evidence indicating that the partnership engaged the attorneys' services with the intent to benefit the limited partners. Cf. Davis v. New Eng. Pest ___ _____ _____________ Control Co., 576 A.2d 1240, 1242 (R.I. 1990).  ___________ -12- 12 determined that the limited partners' claims were time-barred as they filed the present action more than three years after discovery of the attorneys' alleged negligence. Because we conclude that no attorney-client relationship existed in this case, we do not reach the statute-of-limitations issue. Recovery under the damages claims rests on the premise that an attorney-client relationship existed between the limited partners and the attorneys.5 See Church v. ___ ______ McBurney, 513 A.2d 22, 23 (R.I. 1986). To determine whether ________ such a relationship existed in this case, we start with the basic proposition that a partnership is a singular legal entity, and that when that entity retains an attorney, the partnership is the client. See, e.g., Ronald E. Mallen & ___ ____ Jeffrey M. Smith, Legal Malpractice 20.7, at 260 (3d ed. _________________ 1989) (hereinafter, "Mallen & Smith"). Thus, an attorney for a partnership or for a general partner does not thereby undertake representation of limited partners. Id. An ___ attorney, however, may expressly or impliedly undertake simultaneous representation of the partnership and a partner or limited partners. Id. at 261. ___ The Rhode Island Supreme Court has often stated that an attorney-client relationship is contractual in nature, and thus is the product of an agreement of the  ____________________ 5. For purposes of its discussion, the district court assumed that such a relationship existed in this case. -13- 13 parties and may be implied from their conduct. Again, absent such a contractual relationship, the attorneys would have owed no duty to the limited partners. See Church, 513 A.2d ___ ______ at 23. We have said that, to imply a contract, including one between an attorney and a client, the law requires more than an individual's subjective, unspoken belief that the person with whom he is dealing has become his lawyer. Sheinkopf v. _________ Stone, 927 F.2d 1259, 1260 (1st Cir. 1991). Rather, if such _____ a belief is "to form a foundation for the implication of a relationship of trust and confidence, it must be objectively reasonable under the totality of the circumstances." Id. ___ Although the existence of an attorney-client relationship is critical to their success, the limited partners offer only minimal argumentation on this point. After close examination, we conclude that the limited partners' claim ultimately rests on a subjective belief completely unsupported by any indicia that the belief was objectively reasonable or that the limited partners actually relied on such a belief. Cf. id. at 1266. The limited ___ ___ partners point principally to events surrounding the September 14 meeting as evidence establishing that McInnis agreed to represent their interests separately. However, at that meeting McInnis recommended that, because of potential conflicts of interest, the limited partners might wish to retain separate counsel. Later, after consultation between -14- 14 the general and limited partners, general partner Lavin told McInnis that the "group" wanted McInnis to represent them. Even construed in a light favorable to the limited partners, we think McInnis was reasonable in understanding "group" to mean the limited partnership as an entity. Beyond this, the limited partners point to nothing that would indicate that McInnis agreed to represent them as limited partners and McInnis denies having ever agreed to represent the limited partners. Cf. Mallen & Smith 7.2 (whether attorney-client ___ relationship created depends on intent of the parties, including that of the attorney). After the nature of the limited partners' liability became clear to them, they did not seek McInnis's help. Instead, two of them (the Hayeses) sought separate counsel. In contrast, the record strongly supports the implication that the only attorney-client relationship involved in this transaction was that between McInnis and the partnership. Again, McInnis made clear that he agreed to represent the partnership while suggesting that the limited partners seek separate counsel. Although not itself determinative, McInnis billed the partnership directly, and the partnership paid all fees out of partnership funds. At least through August 1988, the scope of McInnis' representation appears to have been limited to preparing the -15- 15 partnership agreement, reviewing partnership's loan documentation, and reviewing the purchase and sale agreement. In the final analysis, we conclude that the limited partners rely on nothing more than repeated conclusory assertions about the nature of their relationship with McInnis, assertions that are completely unsupported by any objective indicia. That is not enough to survive summary judgment on the question of whether an attorney-client relationship actually existed. See Sheinkopf, 927 F.2d at ___ _________ 1266. Consequently, the district court properly granted summary judgment on appellants' claims for damages.6 III. III. ____ CONCLUSION CONCLUSION __________ For the foregoing reasons, the decision of the district court is affirmed. affirmed. ________  ____________________ 6. Appellants present a third theory of recovery, grounded in Rhode Island's consumer protection statute. See R.I. Gen. ___ L. 6-13.1. By its terms, that statute authorizes actions by either the Attorney General or persons who purchase or lease "goods or services primarily for personal, family or household purposes." Id. at 6-13.1-5.2(a). We agree with ___ the district court that the limited partners do not fall within this narrow definition.  -16- 16