OPUS CORPORATION, a Minnesota corporation, Plaintiff,

v.

INTERNATIONAL BUSINESS MACHINES CORPORATION, a New York corporation, Defendant.

Civ. No. 3–95–28.

United States District Court, D. Minnesota.

Aug. 14, 1996.

Charles B. Rogers, Minneapolis, MN, for Opus Corp.

Creighton R. Magid, Minneapolis, MN, for Intern. Business Machines Corp.

## MEMORANDUM ORDER

ERICKSON, United States Magistrate Judge.

### I. *Introduction*

This matter came before the undersigned United States Magistrate Judge pursuant to a general assignment, made in accordance with the provisions of Title 28 U.S.C. § 636(b)(1)(A), upon the Motion of the Plaintiff Opus Corporation ("Opus") to Compel Discovery.

A Hearing on the Motion was conducted on June 6, 1996, at which time Opus appeared by Charles B. Rogers, Esq., and the Defendant International Business Machines Corporation ("IBM") appeared by Creighton R. Magid, Esq.

For reasons which follow, the Motion is denied.

### II. *Factual and Procedural Background*

This case involves a dispute concerning the formation and operation of IBM Associates Limited Partnership (the "Partnership"), an entity that was formed, in 1989, by IBM, which served as the managing general partner, and with Opus as the sole limited partner. The Partnership's purpose was the development of First Bank Place (the "Project")—an office and retail complex that is located in downtown Minneapolis.

In the negotiations which led to the formation of the Partnership, IBM was represented by its in-house counsel, F. Maureen Duffy, and by three attorneys from the law firm of Faegre & Benson ("Faegre")—namely, Charles Ferrell, John Wheaton and Terri Simard. Opus was represented in these negotiations by its own in-house counsel, James Tucker. On June 30, 1989, the Partnership was formally established by a written agreement and, thereafter, Faegre served as the Partnership's legal counsel.

As a condition precedent to the formation of the Partnership, Opus was obligated to secure First Bank Systems, Inc. ("First Bank"), as the Project's anchor tenant. In order to accomplish this goal, Opus com-

menced negotiations with First Bank, which ultimately proved to be successful, in order to induce First Bank to vacate its then-existing offices in downtown Minneapolis, and to relocate its operations in the Project. In these negotiations, Opus was represented by James Dueholm ("Dueholm"), who was another lawyer at Faegre, with whom Opus had a long-standing attorney-client relationship. Apparently, Dueholm's representation of Opus did not continue after the formation of the Partnership, and an informal "Chinese wall" was established within Faegre, so as to isolate Dueholm from the attorneys in the firm who were representing IBM in the Partnership negotiations, and *vice versa*. On the Record before us, it is not disputed that all of the parties to these paralleling negotiations were fully aware that Faegre was representing various interests during the period in which the Partnership was in its formative stages.

As noted, after the Partnership was formed, Faegre assumed the role as the Partnership's counsel, as well as continuing to represent IBM in IBM's capacity as a the general partner and as an investor in the Partnership. In this latter capacity, Faegre represented IBM, on certain occasions, in a manner that was adverse to the interests of Opus. For example, Faegre advised IBM with respect to IBM's contemplated termination of several of the Project's contracts, which related to the construction, leasing and management of the Project, and which extended between the Partnership and Opus or one of Opus' affiliates. In addition, Faegre represented IBM in its negotiation of a settlement between Opus and IBM, which related to Opus' claim that IBM had improperly authorized certain payments to outside consultants who had been retained to provide Project services. Finally, Faegre provided legal counsel when IBM was contemplating the issuance of a substantial capital call to Opus and, subsequently, Faegre provided IBM with legal advices in connection with IBM's exercise of the "cram down" provision, which is contained within the Partnership Agreement, upon Opus' refusal to honor the capital call.[1] In exercising this "cram down" provision, IBM effectively eliminated Opus' interests in both the Partnership, and in the Project.

This action was commenced on January 6, 1995, with the filing of Opus' Original Complaint. On May 15, 1996, with leave of the Court, Opus filed an Amended Complaint in which it asserted a claim against IBM for the breach of a fiduciary duty. As part of the pretrial discovery process, the parties have exchanged so-called "privilege logs," which register those documents which are claimed to be excepted from discovery, either because of an attorney-client or a work product privilege. IBM's privilege log lists some 509 documents, which are the subject of Opus' Motion to Compel.

In support of its Motion, Opus contends that IBM may not shield these documents from discovery on privilege grounds.[2]

1. Article 3.2(f) of the Partnership Agreement has been designated as the "cram down" provision. By this provision, the Contributing Partner—here IBM—could require the non-Contributing Partner—here Opus—to make an additional capital contribution, through the issuance of a capital call, or else have its interest in the Project reduced to zero. In this respect, the "cram down" provision states as follows:

    [I]n the event the Non–Contributing Partner's Partnership Percentage Interest is decreased and the Contributing Partner's Partnership Percentage Interest is increased, * * * **the Contributing Partner shall (x) assume and indemnify the Non–Contributing Partner and its affiliate(s) against all recourse obligations of the Non–Contributing Partner to any person in connection with Partnership business, * * * and (y) shall reimburse the Non–Contributing Partner for payments made by such Non–Con-** **tributing Partner pursuant to any such recourse obligation, to the extent such payments have not been reimbursed by the Partnership.** [Emphasis added]
    This "cram down" provision is at the heart of Opus' breach of contract claim.

2. Since our jurisdiction over the subject matter of this action is founded upon the diversity of the parties' citizenship, we are obliged to apply the Minnesota rules of evidentiary privilege. See, *Rule 501. Federal Rules of Evidence; Simon v. G.D. Searle & Co.*, 816 F.2d 397, 402 (8th Cir. 1987), cert. denied, 484 U.S. 917, 108 S.Ct. 268, 98 L.Ed.2d 225 (1987); *Bituminous Casualty Corp. v. Tonka Corp.*, 140 F.R.D. 381, 386 (D.Minn.1992). Under Minnesota law:

    An attorney cannot, without the consent of the attorney's client, be examined as to any communication made by the client to the attorney

In this respect, Opus' position is somewhat unique, since it does not argue that these documents fail to satisfy the elements that are essential in invoking a privileged status.[3] For example, Opus has not contended that the documents do not reflect communications between an attorney and client, or that the communications were not made in confidence. Rather, Opus maintains that IBM may not invoke a privilege against Opus for two reasons. First, Opus argues that, under the "common interest" doctrine, the parties were joint clients of Faegre, whose communications with Faegre must be mutually shared. Second, Opus maintains that IBM, in its role as the managing general partner of the Partnership, owed Opus a duty of full disclosure and complete candor and, consonant with this duty, IBM may not "hide behind the attorney-client privilege," so as to withhold Partnership documents, or any other information on Partnership matters.

For its part, IBM asserts that the common interest exception is inapplicable since, at all times during which Faegre represented IBM, Faegre was acting contrary to Opus' interests, and not compatibly with them. Therefore, IBM argues, there is no basis upon which the "common interest" doctrine may properly operate. Second, while acknowledging its fiduciary obligations to Opus, as a result of its engagement as the Partnership's managing general partner, IBM argues that, under the "fiduciary exception" to the attorney-client privilege, Opus is entitled to discover otherwise privileged documents only upon a showing of good cause which, IBM insists, has not been presented here.

> or the attorney's advice given thereon in the course of professional duty; nor can any employee of the attorney be examined as to the communication or advice, without the client's consent.
>
> *Minnesota Statutes Section 595.02(1)(b).*

3. In its Motion papers, Opus originally argued that IBM had failed to satisfy its burden of demonstrating that the documents at issue qualified for a privileged status. At the Hearing on the Motion, however, the parties agreed to "meet and confer" on this aspect of the matter and, not having heard further from the parties, we assume that an accord on this aspect of the Motion has been properly reached.

4. Our reference to Wigmore is well-placed given the Minnesota Supreme Court's repeated reli-

## III. *Discussion*

### A. The "Common Interest" Exception.

■ *1. Standard of Review.* "When an attorney acts for two different clients who each have a common interest, communications of either party to the attorney are not necessarily privileged in subsequent litigation between the two clients." *Bituminous Casualty Corp. v. Tonka Corp.,* 140 F.R.D. 381, 387 (D.Minn.1992); see also, *Eureka Investment Corp. v. Chicago Title Insurance Co.,* 743 F.2d 932, 936–37 (D.C.Cir.1984). The parameters of the common interest exception are aptly illustrated by two hypotheticals from Wigmore's classic treatise on the law of evidence.[4] As to the first, "a communication by A to X as the common attorney of A and B, who afterwards become party opponents, is not privileged as between A and B since there was no secrecy between them at the time of communication." *8 J. Wimore. Evidence 52312,* at 605–06 (McNaughton rev. ed.1961). In such an instance, while the privilege may be asserted against a third party, it is unavailable in a dispute between A and B. *Id.* The policy behind this application of the common interest doctrine is "to encourage openness and cooperation between joint clients * * *." *Eureka Investment Corp. v. Chicago Title Insurance Co.,* supra at 937.

As to the second hypothetical:

> A communication by A to X as A's attorney, X being then also the attorney of B, [who] now become[s] the party opponent, is ordinarily privileged because of the relation of X toward A. Nor does the fact of

ance upon that text in explaining the scope of Minnesota's attorney-client privilege. See, e.g., *State v. Gore,* 451 N.W.2d 313, 318 (Minn.1990); *Kahl v. Minnesota Wood Specialty, Inc.,* 277 N.W.2d 395, 398 n. 3 (Minn.1979); *Wenner v. Gulf Oil Corp.,* 264 N.W.2d 374, 378 (Minn. 1978); *State ex rel. Schuler v. Tahash,* 278 Minn. 302, 308, 154 N.W.2d 200 (1967); *Sprader v. Mueller,* 265 Minn. 111, 117–18, 121 N.W.2d 176 (1963); *Baskerville v. Baskerville,* 246 Minn. 496, 502–03, 75 N.W.2d 762 (1956); *Brown v. Saint Paul City Ry. Co.,* 241 Minn. 15, 33–34, 62 N.W.2d 688 (1954); see also, *Simon v. G.D. Searle & Co.,* supra at 403 ("Minnesota adheres to Professor Wigmore's classic statement of the attorney-client privilege, * * * ").

A's knowledge that X is already B's attorney, nor the fact of B's being already adversely interested destroy the privilege. This is so because, although X ought not to undertake to act for both in any matter where there is a possibility of adverse interests, nonetheless A is protected by reason of the relation.

*8 J. Wiamore, Evidence 62312,* at 608.

As Wigmore has properly recognized, while these contrasting circumstances are easily portrayed on paper, "[i]n practice, difficulty will often arise in distinguishing" between the two scenarios. *Id.;* see also, *Eureka Investment Corp. v. Chicago Title Insurance Co.,* supra.

■ 2. *Legal Analysis.* In arguing that the common interest exception applies to defeat IBM's assertion of privilege, Opus maintains, that the situation presented in Wigmore's first hypothetical, is also presented here, with IBM, in its capacity as a potential partner and as an investor in the Partnership, acting as "A," with Opus serving as "B," and with Faegre functioning as attorney "X." We disagree, for absent from this portrayal is any recognition that, while the parties had clearly retained a common law firm, that retention frequently had individualized, and substantially diverse, goals.

During the negotiations which resulted in the formation of the Partnership, Faegre unmistakably represented each of the parties, since it served as Opus' counsel in the negotiations which ensued between Opus and First Bank, and it functioned as IBM's counsel during the pre–Partnership negotiations between IBM and Opus. In neither instance did Faegre serve the common or mutual interests of both IBM and Opus. While Faegre's efforts, in securing First Bank as a anchor tenant of the Project, furthered the interests of the Partnership, there is no showing that Faegre jointly counseled with Opus and IBM in that respect. According to the Record before us, Opus was, exclusively Faegre's client for that purpose and, at best, IBM was an incidental beneficiary of that attorney-client relationship.

As to IBM's retention of Faegre, in order to assist in IBM's negotiations with Opus, there was no commonality of interests, as Opus was separately represented by counsel and, conceptually as well as practically, IBM and Opus had distinct and conflicting interests throughout those contract discussions. As a consequence, any communications between IBM and Faegre, in the context of those negotiations, "were made in the course of representation distinctly not in the interest of [Opus]." *Eureka Investment Corp. v. Chicago Title Insurance Co.,* supra at 937. Accordingly, these communications fall within Wigmore's second hypothetical and, therefore, are privileged from discovery by any third-party, including Opus. *Id.*

■ Moreover, the common interest exception cannot properly overcome IBM's assertion of privilege as to those communications, which transpired between Faegre and IBM following the formation of the Partnership, where the interests of IBM, that Faegre was serving, were separate from the interests of Opus. Obviously, where Faegre was undertaking purely Partnership business for the joint benefit of IBM and Opus, its advices are equally available to IBM and Opus. Here, however, we do not understand that IBM has invoked any privilege that would protect those advices from discovery. Rather, we understand IBM is only opposed to disclosing its confidences with Faegre when those confidences were engrossed within IBM's privately-held interests.

Nevertheless, relying upon the decisions in *Roberts v. Heim,* 123 F.R.D. 614, 624–25 (N.D.Cal.1988); *Hecht v. Superior Court,* 192 Cal.App.3d 560, 566–67, 237 Cal.Rptr. 528 (Cal.Ct.App.1987); and *Wortham and Van Liew v. Superior Court,* 188 Cal.App.3d 927, 931–33, 233 Cal.Rptr. 725 (Cal.Ct.App.1987), rev. denied, (Cal., April 1, 1987), Opus claims that an attorney for a limited partnership, by that representation alone, necessarily serves as counsel for each partner, on an individualized basis. In Opus' view, in representing the Partnership, Faegre undertook an attorney-client relationship with each of the component partners. We disagree.

■ Under the statutory laws of Minnesota, a partnership is a legal entity that is

separate and distinct from its partners.[5] Consistent with this statutory authority, the Minnesota Supreme Court has long-recognized a partnership's status as a legal entity separate from that of its partners. See, *Monson v. Arcand,* 244 Minn. 440, 444, 70 N.W.2d 364 (1955); *Toenberg v. Harvey,* 235 Minn. 61, 66, 49 N.W.2d 578 (1951); *Keegan v. Keegan,* 194 Minn. 261, 263, 260 N.W. 318 (1935). As a consequence, a limited partnership may be sued in its own name, and must maintain an agent to accept service of process within the boundaries of this State. *Minnesota Statutes Section 322A.04(2).* Indeed, the Minnesota Rules of Professional Conduct specifically envision the actuality that an attorney might represent a partnership or other organization, with the attorney's client being the organization itself, and not the organization's constituent members. See, *Rule 1.13(a).  Minnesota Rules of Professional Conduct.*[6] Thus, we conclude that, when representing the Partnership, Faegre's client was the Partnership alone, and not the Partnership's limited or general partners. See, *Rhode Island Depositors Economic Protection Corp. v. Hayes,* 64 F.3d 22, 27 (1st Cir.1995) ("[A] partnership is a singular legal entity, and * * * when that entity retains an attorney, the partnership is the client[;][t]hus, an attorney for the partnership or for a general partner does not thereby undertake representation of limited partners."); *Quintel Corp., N.V. v. Citibank, N.A.,* 589 F.Supp. 1235, 1240 (S.D.N.Y.1984) ("Even if [a law firm] represented the limited partnership, its duty would run to the partnership, not to [a constituent, limited partner] or his counsel."). Accordingly, we conclude that the common interest exception will not defeat IBM's invocation of an attorney-client privilege with respect to the documents at issue. We think this result is particularly compelled where, as here, the law firm which represents the partnership, has been retained to counsel a partner on issues that are separate from the common' interests of the partnership, and it is the communications, which relate to those separate interests, which are the focus of the requested disclosures.[7]

### B. The "Fiduciary" Exception.

■ 1. *Standard of Review.* Under Minnesota partnership law, a limited partner has a statutory right to inspect certain docu-

---

**5.** See, *Minnesota Statutes Sections 16B.33, Subdivision 1(f); 43A.38, Subdivision 1(a); 47,20, Subdivision 2(12); 47.205, Subdivision 1(d); 72A.18, Subdivision 2; 72A.201, Subdivision 3(5) and (8); 80C.01, Subdivision 12; 80D.04, Subdivision 1(a); 86B.005, Subdivision 14; 115C.02, Subdivisions 5a, 5b and 9; 116.06, Subdivision 17; 116.76, Subdivision 15; 116B.09, Subdivision 1; 116B.10, Subdivisions 1 and 4; 148.621, Subdivision 13; 150A.01, Subdivision 7; 238.02, Subdivision 11; 209.17, Subdivision 4(b); 325F.76, Subdivision 5; 327.31, Subdivision 7; 515.02, Subdivision 13; 524.1–201(32); 525.921, Subdivision 7; 609.902, Subdivision 3; and 611A.68, Subdivision 1(d).* Moreover, not one of these statutory provisions differentiates between a general and a limited partnership.

**6.** It should be noted that Rule 1.13(e) does contemplate, in certain instances, an attorney's dual representation of both the organization and the constituents of that organization. See also, *Rhode Island Depositors Economic Protection Corp. v. Hayes,* 64 F.3d 22, 27 (1st Cir.1995) ("An attorney, however, may expressly or impliedly undertake simultaneous representation of the partnership and a partner or limited partners"). We have no such showing here.

**7.** In its Motion papers, and during its argument at the Motions Hearing, Opus has sought to divert our inquiry to the propriety of Faegre's multiple representations. We decline, however, to more fully address Faegre's professional responsibilities to Opus, to IBM, or to the Partnership, as it implicates issues that are unrelated to the merits of Opus' Motion to Compel. Even if we assumed, for the sake of argument, that Faegre ignored conflicts in its representation of Opus and IBM, the assumption would not materially alter IBM's proper assertion of an attorney-client privilege. "[Such a] privilege, being the client's, should not be defeated solely because the attorney's conduct was ethically questionable." *Eureka Investment Corp. v. Chicago Title Insurance Co.,* 743 F.2d 932, 938 (D.C.Cir.1984); see also, *8 J. Wigmore, Evidence § 2312,* at 605–06 (McNaughton rev. ed. 1961)("[A]lthough [an attorney] ought not to undertake to act for [two parties] in any matter where there is a possibility of adverse interests, nonetheless [the party entitled to the privilege] is protected by reason of the relation [between it and the attorney]".). In this respect, we note that Faegre is not a party to this suit, and there is no showing which would emasculate the effectiveness of IBM's attorney-client privilege merely because of Faegre's representation of Opus' interests on unrelated legal matters.

ments.[8] Moreover, under both the State's statutory and common law, partners owe each other fiduciary duties. See, *Minnesota Statutes Sections 322A.87 and 323.20*; see also, *Appletree Square I v. Investmark, Inc.,* 494 N.W.2d 889, 892 (Minn.Ct.App.1993), rev. denied, (Minn., March 16, 1993) ("The relationship of partners is fiduciary and partners are held to high standards of integrity in their dealings with each other."). Furthermore, parties to a fiduciary relationship must disclose material facts to one another. See, *L & H Airco, Inc. v. Rapistan Corp.,* 446 N.W.2d 372, 380 (Minn.1989); *Midland National Bank of Minneapolis v. Perranoski,* 299 N.W.2d 404, 413 (Minn.1980); *Klein v. First Edina National Bank,* 293 Minn. 418, 421, 196 N.W.2d 619 (1972); *Appletree Square I v. Investmark, Inc.,* supra; *Matter of Boss,* 487 N.W.2d 256, 259 (Minn.Ct.App. 1992). rev. denied, (Minn., August 11, 1992).

2. *Legal Analysis.* In support of Opus' contention, that IBM may not, consistent with its fiduciary obligations as a general partner, withhold documents from it on the basis of an attorney-client privilege, Opus cites several decisions in which the Courts have appeared to hold that a general partner's entitlement to invoke an attorney-client privilege is subordinate to its fiduciary obligation to disclose material facts to a limited partner. Under these authorities, a general partner may not assert an attorney-client privilege against a limited partner, in order to prevent the partner's discovery of the communications, between the general partner and its attorney, that are linked to the workings of the partnership. See, *Roberts v. Heim,* supra at 624–25; *Abbott v. Equity*

*Group,* 1988 WL 86826 *2 (E.D.La.1988); *Hecht v. Superior Court,* supra at 567, 237 Cal.Rptr. 528; *Wortham and Van Liew v. Superior Court,* supra at 931–32, 233 Cal. Rptr. 725; *McCain v. Phoenix Resources, Inc.,* 185 Cal.App.3d 575, 579, 230 Cal.Rptr. 25 (Cal.Ct.App.1986), rev. denied, (Cal., December 3, 1986).

Responding to this argument, IBM concedes that a general partner's assertion of privilege may be overcome by its fiduciary obligations to another partner but, to secure discovery of otherwise privileged communications, the inquiring partner must show "good cause" for the disclosures sought. See, *Garner v. Wolfinbarger,* 430 F.2d 1093, 1103–04 (5th Cir.1970), cert. denied, 401 U.S. 974, 91 S.Ct. 1191, 28 L.Ed.2d 323 (1971); *In re ML–Lee Acquisition Fund II, L.P. Securities Litigation,* 848 F.Supp. 527, 563–64 (D.Del.1994); *Ferguson v. Lurie,* 139 F.R.D. 362, 365–66 (N.D.Ill.1991); *Western Gas Processors, Ltd. v. Enron Gas Processing Company,* 1989 WL 20529 *7 (D.Colo.1989).

■ On this issue, we do not accept the legal interpretations of either party, as we conclude that the respective interpretations are premised upon an inevitable conflict between a general partner's duty of disclosure, and its entitlement to assert an attorney-client privilege. In our considered view, the inevitability of that conflict is not a given, as the privilege protects facts, not opinions, and the duty to disclose attaches to material facts, and not protected communications concerning a partner's separate business interests.[9]

8. As here pertinent, Minnesota Statutes Section 322A.28 provides as follows:
    Each limited partner has the right to:
    (1) inspect and copy any of the partnership records * * *; and
    (2) obtain from the general partners from time to time upon reasonable demand (i) true and full information regarding the state of the business and financial condition of the limited partnership, (ii) promptly after becoming available, a copy of the limited partnership's federal, state and local income tax returns for each year, and (iii) other information regarding the affairs of the limited partnership as is just and reasonable.

9. According to our research, and that presented by the parties, neither the blanket assertion of a

"fiduciary exception," as advocated by Opus, nor the more qualified treatment that is commended by *Garner v. Wolfinbarger,* 430 F.2d 1093, 1103– 04 (5th Cir.1970), cert. denied, 401 U.S. 974, 91 S.Ct. 1191, 28 L.Ed.2d 323 (1971), has been endorsed by the Minnesota Supreme Court, by this Court, or by our Court of Appeals. In fact, there is some suggestion within this Circuit that the rule espoused in *Garner* may no longer reflect viable authority in view of more recent holdings by the United States Supreme Court, which implicate the attorney-client privilege. See, *Milroy v. Hanson,* 875 F.Supp. 646, 651 (D.Neb.1995).
    As to the "fiduciary exception," we are mindful that, in *Evans v. Blesi,* 345 N.W.2d 775, 780–81 (Minn.Ct.App.1984), rev. denied, (Minn., June 12, 1984), the Court determined that, in the

■ As we have noted, a partner's fiduciary duties include an obligation to disclose material facts to other partners. *L & H Airco, Inc. v. Rapistan Corp.*, supra; *Midland National Bank of Minneapolis v. Perranoski*, supra; *Klein v. First Edina National Bank*, supra; *Appletree Square I v. Investmark, Inc.*, supra; *Matter of Boss*, supra. Of course, the purpose of the attorney-client privilege is not to thwart the disclosure of otherwise discoverable facts but, rather, to encourage clients to confide openly and fully with their attorneys, without fear that such confidences will be divulged to others, thereby enabling their attorneys to act more effectively on their behalf. See, *National Texture Corp. v. Hymes*, 282 N.W.2d 890, 895–96 (Minn.1979). As a result, by its express statutory terms, the privilege protects communications, and not facts, see, *Minnesota Statutes Section 595.02(1)(b)*; see also, *State v. Jensen*, 286 Minn. 65, 72, 174 N.W.2d 226 (1970), and, accordingly, it is well-settled that otherwise discoverable data does not become immunized from discovery merely because the data has been transmitted to an attorney. *Simon v. G.D. Searle & Co.*, 816 F.2d 397, 403 (8th Cir.1987), cert. denied, 484 U.S. 917, 108 S.Ct. 268, 98 L.Ed.2d 225 (1987), citing *Brown v. Saint Paul City Ry. Co.*, 241 Minn. 15, 62 N.W.2d 688 (1954).

Indeed, our Court of Appeals has recently addressed the distinction between discoverable facts and privileged communications, and has observed that an assertion of the privilege "in no way prevents [opponents of that assertion] from learning facts relevant to the dispute." *In re Bieter Co.*, 16 F.3d 929, 940 (8th Cir.1994). In the words of the Court:

context of a closed corporation, a majority shareholder owed a fiduciary duty of disclosure to a minority shareholder, which precluded, under the facts there, an assertion of an attorney-client privilege when the attorney represented both the corporation and the majority shareholder. The Court did so, without citation of authority, because the "lawyers were in a conflict of interest position and had a duty to advise * * * the minority shareholder * * * of their advice regarding corporate matters." *Id.* at 781. We can accept that, under Minnesota law, "the relationship among shareholders in closely held corporations is analogous to that of partners," but we are not aware of any authority which would allow a fiduciary relationship to trump the attor-

Application of the attorney client privilege to communications such as those involved here * * * puts the adversary in no worse position than if the communications had never taken place. The privilege only protects disclosure of communications; it does not protect disclosure of the underlying facts by those who communicated with the attorney: "[T]he protection of the privilege extends only to *communications* and not to facts. A fact is one thing and a communication concerning that fact is an entirely different thing. The client cannot be compelled to answer the question, 'What did you say or write to the attorney?' but may not refuse to disclose any relevant fact within his knowledge merely because he incorporated a statement of such fact into his communication to his attorney."

*Id.*, at 940–41, quoting *Upjohn Co. v. United States*, 449 U.S. 383, 395–96, 101 S.Ct. 677, 685–86, 66 L.Ed.2d 584 (1981), quoting in turn *City of Philadelphia v. Westinghouse Elec. Corp.*, 205 F.Supp. 830, 831 (E.D.Pa. 1962) [Emphasis in original].

In sum, we are unable to discern any inherent conflict between a general partner's fiduciary obligation to disclose material facts, and its privilege to refuse to disclose attorney-client communications, particularly as they relate to the general partner's private business affairs. Indeed, in our view, the obligation of disclosure, which Opus encourages us to direct, "would severely undermine the attorney-client privilege and could well make it impossible for a general partner to obtain legal advice about matters in which the general partner's interests may conflict with the

ney-client privilege as a punishment for an attorney's representation of two or more clients. *Pedro v. Pedro*, 489 N.W.2d 798, 801 (Minn.App. 1992), rev. denied (Minn., October 20, 1992), citing *Westland Capital Corp. v. Lucht Engineering Inc.*, 308 N.W.2d 709, 712 (Minn.1981) (close corporation has been described as partnership in corporate guise). Notably, in the more than a decade since *Evans* was decided, its election to pierce the attorney-client privilege, on such tenuous legal grounds, has not been followed by any reported decision, and we decline to do so here. *Rothmeier v. Investment Advisers, Inc.*, 85 F.3d 1328, 1339 (8th Cir.1996), quoting *Haugen v. Total Petroleum, Inc.*, 971 F.2d 124, 126 (8th Cir.1992).

limited partners' interests." *Buford White Lumber Co. v. Octagon Properties,* 740 F.Supp. 1553, 1561 (W.D.Okl.1989). We do not understand the governing law to command such a result and, accordingly, Opus' Motion to Compel is denied.

NOW, THEREFORE, It is—

ORDERED:

That the Plaintiff's Motion to Compel Discovery [Docket No. 43] is DENIED.