Lester AGELOFF, Robert Snyder and
Herbert Stern, Plaintiffs,

v.

NORANDA, INC. and Noranda
Finance, Inc., Defendants.

C.A. No. 95–0325L.

United States District Court,
D. Rhode Island.

Sept. 4, 1996.

Joseph V. Cavanagh, Jr., Michael W. Carroll, Blish & Cavanagh, Providence, RI, Paul A. Izzo, Erik Lund, Posternak, Blankstein & Lund, Boston, MA, for Plaintiffs.

Mark A. Pogue, Edwards & Angell, Providence, RI, David C. Greer, John F. Haviland, Bieser, Greer & Landis, Dayton, OH, for Defendants.

### MEMORANDUM AND ORDER

LAGUEUX, Chief Judge.

This matter is before the Court on the appeal of defendants, Noranda, Inc. and Noranda Finance, Inc. ("Noranda"), from Magistrate Judge Timothy M. Boudewyns' Order dated November 14, 1995 denying Noranda's motion to admit out-of-state counsel *pro hac vice*. At a hearing held on October 30, 1995, the magistrate judge held that a prior attorney-client relationship had been established among plaintiffs Lester Ageloff, Herbert Stern and Robert Snyder (collectively "plaintiffs" or "Executives"), and proposed defense counsel, David Greer and John Haviland, as a result of a joint defense agreement entered into by the now adverse parties in May 1992. For the reasons discussed below, the magistrate judge's order is reversed, and the motion to admit Greer and Haviland *pro hac vice* is granted.

### I. *Background*

Lester Ageloff, Herbert Stern, Robert Snyder and Samuel Perelman[1] are former senior executives of Carol Cable Co., Inc. ("Carol Cable"), then a Noranda subsidiary. In this capacity, the Executives conducted negotiations with the Penn Central Corporation ("Penn Central") for the sale of Carol Cable and the assets of Noranda Inc.'s Carol Canada division. During negotiations, the Executives supplied Penn Central with documents, materials and other information pertaining to Carol Cable. In 1990, Penn Central purchased Carol Cable and the assets of Carol Canada from Noranda for approximately $155 million.

Plaintiffs stayed on as senior executives of Carol Cable pursuant to three-year employment agreements which were guaranteed by Penn Central. By November of 1990, however, Penn Central had appointed a new management team at Carol Cable and had discharged the Executives. Despite this, Penn Central continued to make payments to the plaintiffs under their employment agreements.

In May or June 1991, at Penn Central's request, the Executives canceled the employment agreements and replaced them with severance agreements which were similarly guaranteed. The severance agreements provided plaintiffs with essentially the same financial benefits as those to which they were entitled under the employment agreements and endured for the same period of time.

In November 1991, Noranda sued Penn Central in United States District Court in Ohio (the "Ohio Civil Action") asserting breaches and anticipatory breaches of the 1990 Purchase Agreement. Penn Central counterclaimed, alleging that the Executives had made material misrepresentations to Penn Central in connection with the sale of Carol Cable. Noranda chose David C. Greer and John F. Haviland of the Dayton, Ohio law firm of Bieser, Greer & Landis as its counsel.

Soon after, Penn Central pursued the same misrepresentation claims against the

---

1. Perelman is not a party to the present lawsuit.

Executives and Samuel Perelman in Rhode Island Superior Court ("the Rhode Island Civil Action"). Simultaneously, Penn Central ceased payments to the Executives under the severance agreements. To defend themselves, the Executives employed Erik Lund and Paul Izzo of the Boston, Massachusetts law firm of Posternak, Blankstein & Lund.

Faced with identical misrepresentation claims, Noranda and the Executives entered into an agreement dated May 1, 1992 (the "May 1992 agreement") whereby the Executives agreed to assist Noranda's counsel in coordinating the defense of the Ohio Civil Action. In return, Noranda extended a $100,000 line of credit to the Executives to cover defense costs arising out of the Rhode Island Civil Action. Eventually, both Noranda and the Executives reached settlement agreements with Penn Central. The Ohio Civil Action was settled by Noranda's payment of $21.4 million to Penn Central. The Rhode Island Civil Action appears to have been resolved by Penn Central's partial payment of money owed to the Executives under the guaranteed severance agreements, although the terms of the settlement are unclear.

In the present action, the Executives claim that Noranda failed to meet financial obligations allegedly owed to them under the May 1992 agreement. Noranda counterclaims, seeking contribution for the $21.4 million settlement payment which Noranda was allegedly required to make as a result of the Executives' misrepresentations to Penn Central.

On August 30, 1995 Noranda moved, through local counsel, to have Greer and Haviland admitted *pro hac vice* in this case pursuant to Local Rule 5(c). Plaintiffs objected and the matter was referred to Magistrate Judge Boudewyns for determination. He held that by cooperating with Noranda's counsel in the defense of the Ohio Civil Ac-

tion, plaintiffs had established an attorney-client relationship with Noranda's attorneys. Since Noranda's counterclaims involve the same misrepresentation claims asserted in the prior two lawsuits, the magistrate judge concluded that admission of Greer and Haviland would violate Rhode Island Rules of Professional Conduct ("Professional Rules") 1.9,[2] applicable in this Court by virtue of Local Rule 4(d).

Thus, on November 14, 1995, the magistrate judge approved an order that denied Noranda's *pro hac vice* motion, and also (1) disqualified attorneys Greer and Haviland from representing Noranda in this lawsuit, (2) enjoined Noranda from consulting Greer and Haviland for any purpose concerning the first, second and third counts of their counterclaim,[3] and (3) ordered Noranda not to use any information obtained by Greer and Haviland for any purpose related to this litigation.

After hearing oral argument on the appeal by Noranda, the Court took this matter under advisement. The appeal is now in order for decision.

## II. *Standard of Review*

■ A district judge may reconsider any pretrial matter designated for hearing by a magistrate judge "where it has been shown that the magistrate judge's order is clearly erroneous or contrary to law." 28 U.S.C. § 636(b)(1)(A) (1994); Local Rule 32(b)(2), *see also* Fed.R.Civ.P. 72(a). "A finding is clearly erroneous when it is against the clear weight of the evidence, or when the court has 'a definite and firm conviction that a mistake has been committed.'" *Blinzler v. Marriott International, Inc.,* 857 F.Supp. 1, 3 (D.R.I. 1994) (citing *Holmes v. Bateson,* 583 F.2d 542, 552 (1st Cir.1978)).

## III. *Analysis*

In the Court's view, there are only two grounds on which the disqualification of

---

**2.** Rule 1.9. Conflict of Interest: Former Client.
A lawyer who has formerly represented a client in a matter shall not thereafter:
(a) represent another person in the same or a substantially related matter in which that person's interests are materially adverse to the interests of the former client unless the former client consents after consultation; or

(b) use information relating to the representation to the disadvantage of the former client except as [permitted or required].

**3.** Count II avers that plaintiffs breached their fiduciary duty as agents of Noranda; count III alleges that the plaintiffs did so knowingly, willfully and with malice.

Greer and Haviland can be predicated. First, although both sides agree that the May 1992 agreement did not create an express attorney-client relationship between the Executives and Noranda's counsel, an attorney-client relationship could arise by implication from that agreement and/or the conduct of the parties. Alternatively, if Greer and Haviland's representation of Noranda jeopardized the confidentiality of a presently existing joint defense privilege, an implied attorney-client relationship could arise for disqualification purposes.

**A. The Existence of An Implied Attorney–Client Relationship Arising From the Agreement or Conduct.**

■ Noranda argues that the magistrate judge erred in holding that an attorney-client relationship arose between the Executives and Noranda's counsel, therefore, his disqualification of Greer and Haviland under the Rhode Island Rules of Professional Conduct was improper.

Rule 1.9 prohibits a lawyer from successively representing different clients in matters that are substantially related and adverse. In order to determine whether a situation requires attorney disqualification under Rule 1.9, a court needs to determine "(i) whether there is an attorney-client relationship and (ii) if so, whether there. is a substantial relationship between the former representation and present relationship." *See Polyagro Plastics, Inc. v. Cincinnati Milacron, Inc.*, 903 F.Supp. 253, 256 (D.P.R. 1995) (citations omitted). Both parties agree that the subject matter of the prior joint representation and Noranda's present counterclaims are the same. Consequently, resolution of the issue turns on whether an attorney-client relationship, in fact, was created between the Executives and Greer and Haviland with regard to the Ohio Civil Action.

■ The First Circuit recently noted that "[t]he Rhode Island Supreme Court has often stated that an attorney-client relationship is contractual in nature, and thus is the product of an agreement of the parties and may be implied from their conduct." *R.I. Depositors Economic Protection Corp. v. Hayes*, 64 F.3d 22, 27 (1st Cir.1995). To imply an attorney-client relationship, the law requires more than an individual's subjective belief that the person with whom he is dealing has become his lawyer. *Id.* Rather, "if such a belief is 'to form a foundation for the implication of a relationship of trust and confidence, it must be objectively reasonable under the totality of the circumstances.'" *Id.* (quoting *Sheinkopf v. Stone*, 927 F.2d 1259, 1260 (1st Cir.1991)).

While not determinative, the fact that the Executives retained separate counsel and did not pay Noranda's lawyers for services are indicia that an attorney-client relationship did not exist. *See U.S. v. Bay State Ambulance and Hospital Rental Service, Inc.*, 874 F.2d 20, 28 (1st Cir.1989). Also relevant to the inquiry is the intent of the alleged client and the attorney. *Id.* at 28–29. In Ageloff and Stern's virtually identical affidavits,[4] they state that they "previously enjoyed an attorney-client relationship with attorneys David Greer and John Haviland", clearly a legal conclusion. Yet in these same documents they repeatedly refer to Paul Izzo as their "own counsel" while referring to Greer and Haviland as "Noranda's attorneys."

Additionally, the parties' joint defense agreement, entitled simply, "Agreement," states in pertinent part:

"[T]he parties to this Agreement, while they each have separate interests with respect to the claims asserted by Penn Central ... also have common interests in the claims and in the efficient and successful defense of the pending litigation ...

1. All meetings of counsel for Noranda and the Executives and their respective clients to deal with the pending litigation ... shall be conducted under the auspices of a joint defense privilege.

2. The joint defense privilege will not hereafter be waived by any of the parties to this Agreement without the express consent of all the other parties to this Agreement.

Ageloff and Stern describe the May 1992 agreement as providing that their communications with Greer and Haviland would be

---

4. An affidavit from Robert Snyder was not presented to the Court.

subject to a joint defense privilege that allowed them to "speak candidly to *Noranda's attorneys*" (emphasis added). Affidavit of Lester Ageloff; Affidavit of Herbert Stern. Both state that "[i]n reliance on Noranda's promise that our communications would be subject to the joint defense privilege, I assisted Noranda, Greer and Haviland in preparing the defense of the Ohio Civil Action."

In light of their sworn statements, the lack of indicia of an attorney-client relationship and the parties' contractual reference to their "separate" interests regarding the Penn Central litigation in Ohio, the Court finds that it is not objectively reasonable to conclude that the May 1992 Agreement by implication created an attorney-client relationship between the Executives and Greer and Haviland. Nor was there any conduct by the parties that compels a finding that such an implied relationship came into being. In this Court's view, the relevant portions of the May 1992 Agreement merely provided that any information exchanged between the parties would be confidential as to third persons. Therefore the magistrate judge's conclusion that there was an attorney-client relationship was clearly erroneous and contrary to law.

B. The Joint Defense Privilege

■ Joint defense privileges protect communications between an individual and the attorney of another "where the communications are 'part of an on-going and joint effort to set up a common defense strategy.'" *In re Sunrise Securities Litigation*, 130 F.R.D. 560, 573 (E.D.Pa.1989) (quoting *Eisenberg v. Gagnon*, 766 F.2d 770, 787 (3rd Cir.1985)). It is true, as plaintiffs contend, that in order to protect the exchange of confidential information, courts have held that an attorney who serves his or her client's codefendant for a limited purpose becomes the codefendant's attorney for that purpose. *See Wilson P. Abraham Construction Corp. v. Armco Steel Corp.*, 559 F.2d 250, 253 (5th Cir.1977); *United States v. McPartlin*, 595 F.2d 1321, 1337 (7th Cir. 1979); *cert. denied*, 444 U.S. 833, 100 S.Ct. 65, 62 L.Ed.2d 43 (1979); *see also* Paul R. Rice, *Attorney-Client Privilege in the United States* § 4:35, at 4-141 (1993). Also, courts have recognized the existence of a

"fiduciary obligation" or "implied professional relation" between codefendants and their attorneys. *See Westinghouse Electric Corp. v. Kerr-McGee Corp.*, 580 F.2d 1311, 1319 (7th Cir.) *cert. denied*, 439 U.S. 955, 99 S.Ct. 353, 58 L.Ed.2d 346 (1978); *Nemours Foundation v. Gilbane, Aetna, Federal Insurance Co.*, 632 F.Supp. 418, 424 (D.Del.1986); *see also Glueck v. Jonathan Logan, Inc.*, 653 F.2d 746, 748-49 (2nd Cir.1981).

In all the cases cited above, however, as in all the other cases the Court has found, the basis for implying such relationships between co-defendants and their attorneys has been to prevent a *third party* from obtaining an unfair advantage against an original codefendant. In contrast, the present dispute involves the original members of the joint defense team.

■ Further, in order to establish their joint defense privilege, plaintiffs would be required to show that "(1) the communications were made in the course of a joint defense effort, (2) the statements were designed to further the effort, and (3) the privilege has not been waived." *United States v. Bay State Ambulance*, 874 F.2d at 28. While it seems likely that plaintiffs can establish the first two requirements, it is simply not possible for them to meet the third.

■ The law is well-settled that a joint defense privilege is waived in a subsequent controversy between the joint defendants. *See In re Sunrise Securities Litigation*, 130 F.R.D. 560, 573 (E.D.Pa.1989); *In the Matter of Grand Jury Subpoena Duces Tecum Dated November 16, 1974*, 406 F.Supp. 381, 393 (S.D.N.Y.1975); *Garner v. Wolfinbarger*, 430 F.2d 1093, 1103 (5th Cir.1970); *see also Horowitz v. Le Lacheure*, 81 R.I. 235, 101 A.2d 483, 487 (1953); McCormick, *Evidence* § 91, at 335-36 (4th ed. 1992); 8 Wigmore, *Evidence* § 2312, at 605-6 (rev. 1961). A joint defense member who seeks to keep information he or she reveals to counsel as part of the joint defense effort from being shared with other members of the joint defense must request such confidentiality from counsel. *See Brennan's, Inc. v. Brennan's Restaurants, Inc.*, 590 F.2d 168, 173 (5th Cir.1979) (citing *Garner v. Wolfinbarger*, 430

F.2d 1093, 1103 (5th Cir.1970)). Otherwise, it is assumed that any information exchanged as part of the joint defense effort can be freely disclosed to the other members of the joint defense and their counsel. *Id.* Since plaintiffs do not contend that they expressed such a request to Noranda's attorneys, they had no reasonable basis to expect that any information they provided to Noranda's lawyers would be withheld from Noranda personnel. Further, the fact that the May 1992 agreement refers to the parties' "separate" as well as "common" interests strongly suggests that the Executives and Noranda anticipated the possibility of later conflict between themselves. Thus, when the Executives entered into a joint defense agreement with Noranda, the Executives took a knowing and calculated risk that they had more to gain than lose from their confidential sharing of information. *See* Paul L. Seave, "Conflicts and Confidences: Does Conflict of Interest Kill the Joint Defense Privilege?", 7 *Crim. Just.* 1, 11 (1992). Surely these seasoned executives understood that Noranda's attorneys were bound, subject only to nondisclosure to third parties, to rely on and use such communications to further Noranda's interests. Accordingly, the Court finds no basis on which to rationalize the creation of an attorney-client relationship from the joint defense privilege that once existed. The joint defense privilege has now been waived for it is plaintiffs who have brought this action against Noranda on the joint defense agreement and have thus created the situation where Noranda must defend itself and plead all claims it has against plaintiffs arising out of the Penn Central matter.[5] A moribund joint defense privilege cannot be used to conjure up an attorney-client relationship by implication.

Although not directly on point, the Court finds *Trinity Ambulance Service, Inc. v. G & L Ambulance Services, Inc.,*[6] 578 F.Supp. 1280 (D.Conn.1984), to be instructive. In *Trinity,* after coplaintiff Professional Ambulance Services, Inc. ("Professional") realigned itself as a codefendant during the course of litigation, remaining coplaintiff Trinity Ambulance Service, Inc. ("Trinity")[7] and Professional moved to disqualify each other's counsel. The Court concluded that the interaction between Professional's counsel and Trinity, and between Trinity's counsel and Professional, bore "sufficient resemblance to an attorney-client relationship to permit further inquiry into the asserted conflicts of interest." *Id.* at 1283–84. Because each party's claim of confidentiality naturally applied only to third parties and not to each other, however, the Court reached two different results despite the fact that something akin to an attorney-client relationship was recognized by the Court in both instances. *Id.* at 1285. Thus, Professional's motion to disqualify Trinity's counsel was denied, while Trinity's motion was granted in order to prevent the inadvertent disclosure of confidential information to other defendants.

If either the Executives or Noranda, or both, were now being sued by someone outside the joint defense circle, it would be appropriate to imply an attorney-client relationship between the parties and each other's counsel in order to preserve the integrity of their joint defense privilege. But where the parties have no legitimate expectation of confidentiality, such as in a subsequent controversy between joint clients, such a measure is simply not warranted.

■ It may seem improper to some that Greer and Haviland will be able to cross examine plaintiffs about matters they discussed in confidence. But, an appearance of impropriety is clearly not sufficient to warrant disqualification in this situation. *See Olivier v. Town of Cumberland,* 540 A.2d 23, 27 (R.I.1988) (stating that an "appearance of

---

**5.** At bottom, both parties' claims here stem from the claims asserted by Penn Central. As a result, Noranda's counterclaims are compulsory under Fed.R.Civ.P. 13(a).

**6.** The Court's decision in *Trinity* was based on application of a similar version of Model Rules of Professional Conduct 1.9, and Canon 4 of the Model Code of Professional Conduct, which

states that: "[a] lawyer should preserve the confidences and secrets of a client." While Canon 4 has not been adopted in Rhode Island, the inquiry under Canon 4 involves confidentiality concerns that are similar to those addressed under a joint defense privilege, and thus is relevant here.

**7.** Trinity was supported on this motion by coplaintiff Aetna Ambulance Service, Inc.

impropriety alone is 'simply too sJender a reed on which to rest a disqualification order except in the rarest of cases' ") (quoting *Sellers v. Superior Court,* 154 Ariz. 281, 289, 742 P.2d 292, 300 (1987)). Since plaintiffs have waived the privileges in these circumstances and no attorney-client relationship can be implied, there is no legal basis for the disqualification of Greer and Haviland in this case.

■ "It is well-settled that courts have wide discretion in determining the admission of out-of-state attorneys *pro hac vice.*" *Thoma v. A.H. Robins Company,* 100 F.R.D. 344, 348 (D.N.J.1983). Were Noranda denied its chosen counsel, it would suffer a loss of time and money because it would be compelled to retain new counsel who would have to become familiar with the prior comprehensive litigation. *See Government of India v. Cook Industries, Inc.,* 569 F.2d 737, 739 (2nd Cir.1978). In addition, Noranda would lose the benefit of Greer and Haviland's specialized knowledge of its operations. *Id.* Accordingly, there are sound reasons to grant Noranda's motion *pro hac vice.*

IV. *Conclusion*

For the foregoing reasons, the magistrate judge's order is reversed, and Noranda's motion to admit Greer and Haviland *pro hac vice* in this litigation is granted.

It is so ordered.