**ESSEX CHEMICAL CORPORATION and Essex Specialty Products, Inc., Plaintiffs,**

v.

**HARTFORD ACCIDENT AND INDEMNITY COMPANY, et al., Defendants.**

Civil Action No. 93–3438(JCL).

United States District Court, D. New Jersey.

May 23, 1997.

Robert D. Chesler, Michael J. McDonald, Lowenstein, Sandler, Kolh, Fisher & Boylan, Roseland, NJ, for Essex Chemical Corp.

Robert D. Chesler, Lowenstein, Sandler, Kolh, Fisher & Boylan, Roseland, NJ, for Essex Specialty Products, Inc.

Grace C. Guiffdrida, Melito & Adolfsen, P.C., New York City, for Hartford Acc. and Indem. Co.

Frances J. Phillips, Luce, Forward, Hamilton & Scripps, New York City, for Westport Ins. Corp.

William E. McGrath, Jr., Smith, Stratton, Wise, Heher & Brennan, PC, Princeton, NJ, Honora M. Keane, Skadden, Arps, Slate, Meagher & Flom, LLP, Newark, NJ, for Home Indem. Co.

Ernest Douglas Sederholm, Guy A. Cellucci, White and Williams, Westmont, NJ, for Insurance Co.

Antonio D. Favetta, Garrity, Graham, Hawkins & Favetta, PC, Montclair, NJ, for Lexington Ins. Co.

Stephen D. Cuyler, Cuyler Burk, Parsippany Corp. Center, Parsippany, NJ, for Northbrook Ins. Co.

Lila Wynne Williams, Marshall, Dennehey, Warner, Coleman & Goggin, PC, Cherry Hill, NJ, for Puritan Excess & Surplus Lines Ins. Co.

Gerald A. Hughes, Hughes & Hendrix, PC, Trenton, NJ, for Zurich Ins. Co.

## OPINION

HEDGES, United States Magistrate Judge.

### I. INTRODUCTION

Plaintiffs Essex Chemical Corporation and Essex Specialty Products, Inc. ("Essex") seek an order disqualifying all defense counsel due to the existence of a conflict of interest.[1] Alternatively, Essex requests that I direct all defense counsel to respond to interrogatories which pertain to communications and documents exchanged between all defense counsel. I have considered the papers submitted in support of and in opposition to the motion. I heard oral argument on April 28.1997.

### II. BACKGROUND

This motion arises in a declaratory judgment action brought by Essex seeking insurance coverage from primary, umbrella, and excess insurers for property damage at various facilities. Essex's motion focuses on Skadden's representation of Essex beginning in May of 1988 when a joint venture partner of Essex attempted a hostile takeover of it.[2] From the time of this hostile takeover attempt until Essex was acquired by The Dow Chemical Company ("Dow") in October 1988, Essex was represented by Skadden. Farley Cert., ¶¶ 4, 5. Skadden also represented Essex in litigation which arose from this same takeover attempt. Farley Cert., ¶¶ 2, 3. Throughout its representation of Essex, Skadden had access to documents protected by the attorney/client privilege and the work

product doctrine. Farley Cert., ¶¶ 3, 4, 6. Skadden also had close contact with senior Essex personnel, including its general counsel, chief financial officer, and board members. Farley Cert., ¶¶ 3, 4.

Moreover, during the time leading up to Dow's purchase of Essex, Skadden participated in what was commonly known as "white knight shows." The purpose of these presentations was to allow potential buyers to learn of the environmental status of properties and any potential environmental liabilities that arose from past practices at the Essex sites. To help Essex prepare for the white knight shows, Skadden worked closely with its investment banker and met continually with senior Essex personnel. Farley Cert., ¶ 4. Essex personnel set up a data room containing volumes of corporate documents which related to aspects of Essex's business. Farley Cert., ¶ 4. Skadden became familiar with both the assets and liabilities of Essex. Farley Cert., ¶ 6.

Here, Skadden was retained by defendant Home Insurance Company ("Home"), one of the primary insurers of Essex. The other named defendants which issued primary, umbrella, and/or excess policies are defendants Hartford Accident and Indemnity Company ("Hartford"), Lexington Insurance Company ("Lexington"), Northbrook Insurance Company ("Northbrook"), Westport Insurance Corporation ("Westport")[3], Home Indemnity Company ("Home"), Insurance Company of North America ("INA"), and Twin City Fire Insurance Company ("Twin City").[4] In 1996,

---

1. Essex had also sought to disqualify Skadden, Arps, Slate, Meagher & Flom ("Skadden"), counsel for defendant Home Insurance Company. However, by letter dated April 8, 1997, Timothy G. Reynolds of Skadden informed David A. Thomas, counsel for Essex, that Skadden was withdrawing. Thomas Reply Cert., Ex. A. Indisputably, Skadden had previously represented Essex in a number of matters, which created a conflict with Skadden's representation here. I will consider this conflict only as it relates to Essex's motion to disqualify the remaining defense counsel.

2. Essex also asserts that Skadden had represented it in a number of matters prior to May of 1988, including products liability claims. a 1963 transaction involving a change in management at a New Jersey facility. and a 1968 purchase of a

portion of that same New Jersey facility. Zonis Cert., ¶ 5. As Skadden's representation during the 1988 hostile takeover attempt and subsequent acquisition by Dow relates to the pending motion, I will discuss Skadden's representation beginning only in the spring of 1988.

3. Puritan Insurance Company was a predecessor to Westport, which is represented by the firm of Luce. Forward. Hamilton & Scripps.

4. On February 28.1997, Essex moved to amend the First Amended Complaint to assert additional claims against defendants and to add Twin City as a defendant. On March 11, 1997, an order was filed pursuant to which Twin City was named as a defendant and claims were asserted against Hartford for breach of duty of good faith and fair dealing regarding the claims handling at

three years after this action was commenced, all of the defendants entered into the "ECC Coverage Litigation Joint Defense and Cost Sharing Agreement" ("Joint Defense Agreement"). Walsh Cert. ¶ 4. Defendants assert that the purpose of this Joint Defense Agreement was to enable the insurance carriers to manage the litigation in an orderly and cost efficient fashion by coordinating discovery.[5] Walsh Cert., ¶¶ 4, 5. Defendants deny that the creation of such a Joint Defense Agreement suggests that they shared identical legal interests in defending this action. In fact, Hartford asserts that its interests may be adverse to the other defendants regarding trigger, allocation and the existence of aggregate limits in the Hartford insurance policies. Essex asserts that all defense counsel, as participants of the Joint Defense Agreement, necessarily consulted with one another in defending against its claims. Essex also asserts that all defense counsel had access to confidential and privileged information which Skadden received from its former client, Essex.

During the course of discovery, defendants have deposed former employees of Essex regarding the 1988 acquisition of Essex by Dow as well as the environmental disclosures made during the acquisition process. Essex claims that these discovery efforts focused on the environmental status of the properties as well as the practices of Essex which may have led to environmental liabilities.

Defendants argue that in any environmental liability litigation there are questions as to whether the insured had knowledge of the site contamination. Walsh Cert., ¶ 10. In addition, it is commonly known that corporations seeking to acquire another entity will make inquiries regarding the acquisition's environmental liability status. Walsh Cert., ¶ 10. Therefore, defendants argue it was reasonable for them to inquire into the 1988 acquisition of Essex and the triggering of New Jersey's Environmental Clean–Up Responsibility Act ("ECRA"). Walsh Cert., ¶ 10.

On January 24, 1997, during the deposition of Deirdre Farley, former in-house counsel of Essex, it first became aware of Skadden's prior representation of Essex. Thomas Cert., ¶ 4. After bringing this concern to the attention of defense counsel, Essex moved for disqualification.[6]

### III. DISCUSSION

Local Civil Rule 103.1(a) of this Court provides that,

> [t]he Rules of Professional Conduct of the American Bar Association as revised by the New Jersey Supreme Court shall govern the conduct of the members of the bar admitted to practice in this Court, subject to such modifications as may be required or permitted by federal statute, regulation, court rule or decision of law.

Accordingly, to resolve this motion for disqualification, I turn to the New Jersey Rules of Professional Conduct ("RPC").

Motions to disqualify are viewed disfavorably, and disqualification is considered a drastic remedy. As a result, courts should hesitate to disqualify counsel unless absolutely necessary. *Carlyle Towers Condominium Ass'n, Inc. v. Crossland Savings, FSB*, 944 F.Supp. 341, 345 (D.N.J.1996). Under any circumstances, disqualification of counsel during pending litigation "does a great disservice to the affected client." *Dewey v. R.J. Reynolds Tobacco Co.*, 109 N.J. 201.221, 536 A.2d 243 (1988). Therefore, the reviewing court must closely scrutinize the facts before it to avoid unjust results. *Carlyle Towers*, 944 F.Supp. at 345; *Reardon v. Marlayne, Inc.*, 83 N.J. 460, 469, 416 A.2d

---

a particular Essex site. Pursuant to the same order, claims under additional policies issued by defendant Puritan were allowed to be made. Thereafter, on May 1, 1997, the remaining portion of plaintiffs' motion to amend its Complaint, regarding additional claims against defendants Northbrook and Home, was granted.

5. Defendants contend that since the creation of the joint defense group participation of Skadden

has been minimal. Several defense counsel have certified that there has been no "substantive interaction" with Skadden concerning Essex or the taking of discovery here. Walsh Cert. ¶ 9. Favetta Cert. ¶ 2, Sederholm Cert. ¶ 2, Peluso Cert., ¶ 2.

6. Defense counsel certify that they were unaware of Skadden's prior representation until Essex brought it to their attention.

852 (1980) (stressing that disqualification appropriate only after undertaking "painstaking analysis of the facts and precise application of precedent").

■ "Although doubts are to be resolved in favor of disqualification, the party seeking disqualification must carry a 'heavy burden' and must meet a 'high standard of proof,' *Evans v. Artek Sys. Corp.*, 715 F.2d 788, 791 (2d Cir.1983), before a lawyer is qualified." *Alexander v. Primerica Holdings, Inc.*, 822 F.Supp. 1099, 1114 (D.N.J.1993); *see Host Marriott Corp. v. Fast Food Operators, Inc.*, 891 F.Supp. 1002, 1007 (D.N.J.1995). Likewise, while a party cannot claim a right to choose specific counsel, *International Business Machines Corp. v. Levin*, 579 F.2d 271, 283 (3d Cir.1978), "a party's choice of counsel is entitled to substantial deference." *Alexander*, 822 F.Supp. at 1114.

### A. Conflict Arising From Successive Representations in Substantially Related Matters

Essex claims that all defense counsel must be disqualified as a result of their relationship with Skadden. As it relates to the present motion. I will address the conflict which arose from Skadden's former representation of Essex.[7]

■ Under RPC 1.9,

(a) A lawyer who has represented a client in a matter shall not thereafter: (1) represent another client in the same or a substantially related matter in which that client's interests are materially adverse to the interests of the former client unless the former client consents after a full dis-

closure of the circumstances and consultation with the former client.

The test for disqualification under RPC 1.9(a)(1) is three-pronged: (I) a prior attorney-client relationship must have existed; (2) the interest of the current client must be materially adverse to those of the former client; and (3) the current representation must involve the same or a substantially related matter.[8] *Host Marriott Corp.*, 891 F.Supp. at 1007. "[A] substantial relationship between matters will exist where the 'adversity between the interests of the attorney's former and present clients ... has created a climate for disclosure of relevant confidential information.'" *Reardon*, 83 N.J. at 472, 416 A.2d 852 (*quoting* Note, *Attorney's Conflict of Interests: Representation of Interest Adverse to That of Former Client*, 55 BOSTON U.L.REV. 61, 73 (1975)).[9]

■ The court must focus on whether during "'the course of the former representation the attorney might have acquired information related to the subject matter of his subsequent representation.'" *Jack Eckerd Corp. v. Dart Group Corp.*, 621 F.Supp. 725, 730 (D.Del.1985) (*quoting Richardson v. Hamilton International Corp.*, 469 F.2d 1382, 1385 (3d Cir.1972)). The moving party need not demonstrate that an actual breach of confidence occurred before disqualification is warranted. but "only a showing of the possibility of such a breach by virtue of the similarity of representations." *In re Corn Derivatives Antitrust Litigation*, 748 F.2d 157, 162 (3d Cir.1984); *see Wilson P. Abraham Construction Corp. v. Armco Steel Corp.*, 559 F.2d 250, 252 (5th Cir.1977).

Once the RPC 1.9(a)(1) test has been satisfied, "'the court need not inquire whether

---

7. As previously noted. Skadden has withdrawn from representation of Home.

8. Skadden had represented Essex in a number of legal matters, thus satisfying the first prong of the test for disqualification. Additionally, in defending this action (which involves claims arising under insurance policies issued by Home), Home's interests are materially adverse to those of Essex. the insured. Accordingly, I will discuss only the substantial relationship prong of the RPC 1.9 test.

9. The New Jersey Supreme Court decided *Reardon* before the adoption of the Rules of Profes-

sional Conduct. *Dewey v. R.J. Reynolds Tobacco Co.*, 109 N.J. 201, 212, 536 A.2d 243 (1988). In *Reardon*, the court stated a three prong test for determining whether there was a basis for disqualifying an attorney due to his or her successive representation of opposing interests. 83 N.J. at 208, 416 A.2d 327. While the *Reardon* test is no longer controlling, *Dewey*, 109 N.J. at 212, 536 A.2d 243, the basic principles of *Reardon* regarding an attorney's ethical obligations still have precedential value. *See Host Marriott Corp.*, 891 F.Supp. at 1007, *Carlyle Towers*, 944 F.Supp. at 350; *Dewey*, 109 N.J. at 212–13, 536 A.2d 243.

the attorney in fact received confidential information, because the receipt of such information will be presumed.'" *Host Marriott Corp.* 891 F.Supp. at 1007 (*quoting Bagdan v.Beck*, 140 F.R.D. 660, 668 (D.N.J.1991)); *see Wilson P. Abraham Construction Corp. v. Armco Steel Corp.*, 559 F.2d 250, 252 (5th Cir.1977). The court must not inquire whether the attorney actually received such information or whether the attorney is planning to use the damaging disclosures in a manner detrimental to his former client. *Emle Industries, Inc. v. Patentex, Inc.*, 478 F.2d 562, 571 (2d Cir.1973).

■ Here, I find a similarity between the factual bases of both the present action and Skadden's prior representation of Essex. The information and confidences to which Skadden had access while representing Essex throughout the 1988 takeover attempt and acquisition process substantially relates to the subject matter of the firm's representation of Home in the instant action. In preparing for the litigation that arose from the takeover attempt, Skadden became privy to the events surrounding the takeover and Essex's position as a party to the suit. In preparing for the white knight shows, Skadden had access to Essex's confidential documents as these related to Essex's past practices at its plant sites. Finally, during the negotiations with Dow for the acquisition of Essex, Skadden had worked closely with the investment banker and senior personnel of Essex.

In defending the present action. defense counsel inquired into the environmental status of the Essex properties and the past practices of Essex which potentially led to the property damage. For instance, during the depositions of former Essex employees, defense counsel questioned former Essex employees about aspects of the white knight shows of 1988 and the circumstances surrounding the Dow acquisition. Walsh Cert., ¶ 10. The purpose of such questioning was to determine the extent of Essex's knowledge, if any, concerning site contamination and when Essex first obtained such information. Walsh Cert., ¶ 10.

Hartford has certified that such inquiries are commonly made in cases where the un-derlying claims concern ECRA sites or sites which were acquired by an outside entity prior to the report of such claims. Walsh Cert., ¶ 10. While this may be true, such a practice still demonstrates that the matters are substantially related, thus satisfying the third prong of the RPC 1.9(a)(1) test and compelling the disqualification of Skadden under RPC 1.9(a)(1).

### B. Conflict Arising From Membership in a Joint Defense Group

■ Essex asserts that the creation of the Joint Defense Agreement by all defense counsel compels the disqualification of the remaining defense counsel. Presumably, as members of the defense group defense counsel had access to confidential information to which Skadden was privy from its prior representations of Essex. The presumed sharing of such confidential information raises a conflict of interest for all defense counsel. In any event, Essex claims that participation in the Joint Defense Agreement creates an appearance of impropriety.

In support of its motion. Essex relies on decisions which granted a motion to disqualify co-counsel. *See, e.g., Putnam Resources, Ltd. v. Sammartino, Inc.*, 124 F.R.D. 530 (D.R.I.1988): *Cheng v. GAF Corp.*, 631 F.2d 1052 (2d Cir.1980), *vacated on other grounds*, 450 U.S. 903, 101 S.Ct. 1338, 67 L.Ed.2d 327 (1981). For example, in *Putnam Resources*, a claim was brought by a creditor against a debtor and a competing creditor. The plaintiff-creditor was represented by two firms, the lead counsel having previously represented the defendant-creditor in a prior loan transaction with the defendant-debtor. 124 F.R.D. at 531. As a result of this former representation, the defendants moved to disqualify both plaintiff's lead counsel and co-counsel in the subsequent action on the grounds that co-counsel effectively "stood in the shoes of Roberts–Carroll [lead counsel]" for purposes of the later suit. 124 F.R.D. at 531. The court granted defendants' motion to disqualify plaintiff's lead counsel on the grounds that the two representations were substantially related. 124 F.R.D. at 532. The court then determined whether co-counsel should be disqualified.

Focusing on the relationship between plaintiff's lead and co-counsel, the court concluded that the nature of such a relationship "places the former in a position to receive confidences regarding Shawmut [the defendant-creditor] and moreover gives the appearance of impropriety." 124 F.R.D. at 533. The court presumed that lead counsel shared this earlier acquired information with co-counsel. 124 F.R.D. at 533. Allowing co-counsel to continue would create a risk that confidential information obtained during the former representation of the defendant-creditor could be used against it. 124 F.R.D. at 533.[10]

I find there exists a risk that the confidential information acquired by Skadden during its prior representation may be used to the detriment of Essex. I also presume that such confidential and privileged information has been shared between all participants to the Joint Defense Agreement, despite defense counsel's certifications to the contrary. Allowing all defense counsel to remain indirectly creates the same risk that the representation by Skadden posed directly, despite the lack of a prior direct attorney-client relationship between Essex and the defense counsel.

Melito & Adolfsen ("Melito"), counsel for Hartford, asserts that absent an attorney-client relationship between Essex and it, Essex must show that defense counsel actually received confidential information from Skadden. However, assuming Melito correctly states the law, I deem it appropriate to decide the pending motion as if an implied attorney-client relationship exists between Essex and all defense counsel in light of the Joint Defense Agreement entered into by all defense attorneys.[11] To protect the sharing

of confidential information, courts have determined that "an attorney who serves his or her client's codefendant for a limited purpose becomes the codefendant's attorney for that purpose." *Ageloff v. Noranda, Inc.*, 936 F.Supp. 72, 76 (D.R.I.1996); *see Wilson P. Abraham Construction Corp.*, 559 F.2d at 253; *United States v. McPartlin*, 595 F.2d 1321, 1337 (7th Cir.1979).

■ Defense counsel assert that any communications shared pursuant to the Joint Defense Agreement is protected by the joint defense privilege. The privilege was designed to protect communications shared when individuals with separate attorneys consult together on issues of common legal interest. *Haines v. Liggett Group, Inc.*, 975 F.2d 81, 84 (3d Cir.1992). Courts have recognized a 'fiduciary obligation' or 'implied professional relation' between codefendants and their legal counsel. *Ageloff v. Noranda, Inc.*, 936 F.Supp. 72, 76 (D.R.I.1996); *see Glueck v. Jonathan Logan, Inc.*, 653 F.2d 746, 748–49 (2d Cir.1981); *Westinghouse Electric Corp. v. Kerr–McGee Corp.*, 580 F.2d 1311, 1319 (7th Cir.), *cert. denied*, 439 U.S. 955, 99 S.Ct. 353, 58 L.Ed.2d 346 (1978);.

■ To establish the joint defense privilege, defendants must show that (1) the communications were exchanged during a joint defense effort; (2) the communications were designed to further the effort; and (3) the privilege was not waived. *In re Bevill, Bresler & Schulman Asset Management Corp.*, 805 F.2d 120, 126 (3d Cir.1986). I am satisfied that all of the elements have been met, thus establishing that a joint defense privi-

**10.** The magistrate judge's decision to grant the disqualification motion was appealed. Thereafter, the district judge reversed the disqualification only of co-counsel. However, absent any expressed reason to reverse, I adopt the analysis supporting the magistrate judge's decision to disqualify co-counsel.

**11.** Melito also contends that should I apply the presumption of shared confidences, defense counsel has effectively rebutted the presumption. Walsh Cert., Sambursky Cert. I decline to conduct a hearing to determine whether there had been actual disclosures made to Melito and the

other defense counsel. Such a hearing would require defense counsel to reveal the content and extent of the communications and information shared under the Joint Defense Agreement. Such inquiries would be necessary to determine to what extent, if any, confidential information. which was shared between Essex and Skadden, was also shared with the other defense counsel. In light of the fact that all defense counsel claim that communications shared among them are protected by the joint defense privilege and/or work product doctrine, defense counsel cannot rebut the presumption.

lege exists as to communications arising under the Joint Defense Agreement.

■ Defense counsel maintain that there have been no substantive discussions between Skadden and the other defense counsel concerning Essex. However, defense counsel assert that Essex's proposed interrogatories violate the joint defense privilege, attorney-client privilege, and/or work product doctrine because the interrogatories seek to obtain "privileged joint defense communications." Melito Brief, at 11. Defendants cannot enjoy the benefits of the privilege without accepting its burdens. In other words. defendants cannot claim that Skadden did not share any confidential information about Essex while maintaining that joint communications are protected by a recognized privilege, and so cannot be inquired into by Essex. I decline to compel defense counsel to respond to interrogatories pertaining to their relationship with Skadden. I find that the joint defense privilege is applicable. I find that an actual conflict of interest exists, justifying the disqualification of all defense counsel.

## C. Appearance of Impropriety

■ Essex further asserts that all defense counsel should be disqualified on the grounds that there exists an "appearance of impropriety" in violation of RPC 1.7(c)(2) and RPC 1.9(b). RPC 1.7(c)(2) provides:

In certain cases or situations creating an "appearance of impropriety" rather than actual conflict, multiple representation is not permissible.

The New Jersey Supreme Court added a new paragraph to RPC 1.9 which now applies the provisions of RPC 1.7(c) to successive representation problems covered by RPC 1.9. RPC 1.9(b); see Dewey, 109 N.J. at 214, 536 A.2d 243. Under an appearance of impropriety analysis, a court must focus on whether "an ordinary knowledgeable citizen acquainted with the facts" would conclude that all the defense counsel's continued representations pose "substantial risk of disservice to either the public interest or the interest of one of the clients." RPC 1.7(c)(2); Dewey, 109 N.J. at 215–16, 536 A.2d 243.

"The maintenance of public confidence in the propriety of the conduct of those associated with the administration of justice is so important a consideration that we have held that a court may disqualify an attorney for failing to avoid even the appearance of impropriety." Levin, 579 F.2d at 283: Kramer v. Scientific Control Corp., 534 F.2d 1085, 1088–89 (3d Cir.1976). Mindful of these considerations, I am satisfied that an ordinary citizen would conclude that an appearance of impropriety exists here. The Joint Defense Agreement, under which all defense counsel have participated. creates a presumption that Skadden shared, or could have shared, with them confidential information obtained from Skadden's prior representation of Essex.

By their participation in the Joint Defense Agreement, all of the defense counsel have created a relationship with Skadden such that it placed them in a position to have access to confidences regarding Essex. Such a relationship creates an appearance of impropriety. Accordingly, under RPC 1.7(c)(2) and 1.9(b), a sufficient showing has been made which warrants disqualification of all the defense counsel.

## IV. CONCLUSION

For the reasons set forth above, the motion of plaintiffs to disqualify all the defense counsel is **GRANTED.** An appropriate Order accompanies this Opinion.