MARGARET REARDON AND DANIEL REARDON, PLAINTIFFS-APPELLANTS, v. MARLAYNE, INC., T/A BEAR BRAKE PALISADES AND GENERAL MOTORS CORPORATION, DEFENDANTS-RESPONDENTS.

Argued October 10, 1979—Decided July 17, 1980.

*John E. Patton* and *Paul J. Jackson* argued the cause for the appellants (*Gaccione, Pomaco, Patton & Beck*, attorneys; *Paul J. Jackson* on the brief).

*Thomas L. Morrissey* argued the cause for the respondent General Motors Corporation (*Carpenter, Bennett & Morrissey*, attorneys; *Robert E. Turtz* on the brief).

*Thomas T. Chappell* filed a letter memorandum on behalf of respondent Marlayne, Inc., t/a Bear Brake Palisades (*Lamb, Hutchinson, Chappell, Ryan & Hartung*, attorneys).

The opinion of the Court was delivered by

CLIFFORD, J.

The issue on this appeal is disqualification of counsel. Our decision turns on an attorney's duties to protect the confidences of his client, *DR* 4–101, and to avoid even the appearance of impropriety, *DR* 9–101. Defendant General Motors Corporation (General Motors) seeks to prevent plaintiffs' attorney, John E. Patton, and the firm of which he is a member, from participating in this product liability suit on the grounds that Patton formerly represented General Motors while an associate in the law firm of Carpenter, Bennett & Morrissey, defendant General Motors' counsel. Judge Bilder, sitting at the trial level, granted General Motors' motion for disqualification in a comprehensive opinion, 163 *N.J.Super.* 529 (Law Div.1978), and the Appellate Division affirmed, substantially on the basis of Judge Bilder's reasoning. 167 *N.J.Super.* 11 (1979). We granted leave to appeal, 81 *N.J.* 254 (1979), to address this question of first impression in New Jersey. We now affirm.

## I

Plaintiffs seek recovery for personal injuries sustained by plaintiff Margaret Reardon when the brakes on her automobile failed, causing the car to hit a pole. The vehicle was manufactured by defendant General Motors. About four months prior to the accident defendant Marlayne, Inc., t/a Bear Brake Palisades (Marlayne), performed a "brake job" on the car. Plaintiffs base defendants' alleged liability on a faulty brake hose.

Defendant General Motors is represented by Carpenter, Bennett & Morrissey (the Carpenter firm), a law firm averaging some 19 partners and 23 associates. Plaintiffs are represented by Gaccione, Pomaco, Patton & Beck (the Gaccione firm), a seven person law firm in which Patton is one of the partners. Prior to joining the Gaccione firm, Patton was employed as an associate of the Carpenter firm for a period of ten years from 1966 to 1976, during which time that firm represented General Motors in the defense of numerous product liability suits. Patton left the Carpenter firm in April, 1976. The present suit, in which Patton has a vital role, was instituted in April, 1978.

During the years 1970 to 1976 the number of attorneys in the Carpenter firm ranged from a low of 34 in 1976 (18 partners, 16 associates) to a high of 48 in 1975 (18 partners, 30 associates). The firm was departmentalized, with Patton being assigned to a specialized group of attorneys identified as the "Product Liability-Negligence/Litigation" group. General Motors was and still is a major client of the Carpenter firm. During Patton's tenure with the firm he assisted in the handling of over 50 actively litigated General Motors cases. Based on a review of the firm's ledger sheets which indicate the type of work done and the hours devoted by each attorney to each client, it is estimated that Patton spent at least 50% of his time from 1970 through 1976 working on General Motors product liability cases and 25% of his time on such matters from 1967 to 1970. Patton's duties at the firm and his exposure to the firm's work product were described in an affidavit by a Carpenter firm partner:

During his association with the firm, Mr. Patton, in working on General Motors product liability litigation, had full access to all file materials including corre-

spondence from the client, its consultants and experts, internal memoranda obtained in the preparation of the defense, technical engineering materials prepared by the client and its consultants and other materials which would not have been available to him in other than his professional capacity as an attorney representing General Motors. Mr. Patton routinely discussed with me, and those of my partners who were handling General Motors litigation, the Corporation's approach to settlement, its recordkeeping methods and its policies, practices and procedures relating to product liability claims.

Although the General Motors cases involved a variety of alleged vehicle defects and several different fact patterns, two in particular, captioned as Krieger v. General Motors Corporation and Morgan v. General Motors Corporation, had fact patterns and alleged brake defects similar to those at issue in the present litigation. The Plaintiff in Morgan alleged that a defective breaking system in a 1967 GMC truck caused the truck to run into a line of stopped traffic. In Krieger the plaintiff alleged a defective braking system in a 1966 Buick caused the car to go out of control on a steep downgrade and strike a tree. The defect asserted in that case was of the very nature alleged in the instant case—a defective brake hose—in a 1966 car, the same year of manufacture as that of the Reardon vehicle. The Carpenter firm considers Patton's work on the Krieger and Morgan cases to have been substantial. His involvement included the taking of party and witness depositions, the preparation of interrogatories and legal memoranda, attendance at settlement conferences and on-site inspection, and the development of possible theories of defense.

Because of Patton's substantial exposure to background information concerning General Motors at the Carpenter firm, that firm contends he should be disqualified from representing the plaintiffs in the instant suit against General Motors. Patton claims that the Carpenter firm affidavits are "exaggerated, misleading, incomplete and inaccurate." His recollections concerning the time he spent on General Motors cases are substantially different. Although he agrees that he had access to all General Motors files while at the Carpenter firm, he contends that he was denied access to any secrets or confidences of General Motors because of his status as an associate. He further argues that the information he was exposed to at the

Carpenter firm is information which would be available to any attorney through the discovery process or secondary sources.

The trial court granted the Carpenter firm's motion and ruled that Patton and his law firm would be disqualified from representing the plaintiffs in the instant suit. 163 *N.J.Super.* at 541. The disqualification was based on an attorney's obligation to protect the confidences of his client and to avoid even the appearance of impropriety. *Id.* at 533–34. Following the majority rule the trial court interpreted our Disciplinary Rules to provide that attorneys individually, as well as their firms, may not appear in opposition to former clients in the same litigation or in a different suit if such a case involves "substantially related matters". *Id.* at 534.

The court found that such a substantial relationship existed between the issues in the present suit and those in the Krieger and Morgan cases in which Patton had been actively involved while associated with the Carpenter firm. Further, the court found that Patton's participation in those two cases, as well as in other General Motors litigation, provided ample justification for the conclusion that Patton had knowledge of General Motors' confidences and secrets. *Id.* at 537–39. Indeed, the court noted, "Far less than this extensive and meaningful activity should give rise to disqualification." *Id.* at 538. Because of the nature of the disqualification the court found that it would be inappropriate for any of Patton's work product to be available for use against General Motors. Patton was ordered to furnish the plaintiffs with a blank substitution of attorney.[1] *Id.* at 541.

---

[1] In a short hearing convened to discuss the form of the above order Patton attempted to dismiss the claims against General Motors and indicated that he would not oppose a motion for summary judgment by the Carpenter firm on behalf of General Motors. According to Patton these offers were predicated on an expert's report received prior to the Carpenter firm's disqualification motion, to the effect that the sole cause of the brake failure was improper installation and inspection by the defendant Marlayne. Patton also attempted to submit a statement signed by the plaintiffs expressing their agreement to the dismissal, without prejudice, of General Motors as a defendant so that Patton's firm could continue as their counsel against defendant Marlayne. General

## II

It has been noted that "the Code of Professional Responsibility is not designed for Holmes' proverbial 'bad man' who wants to know just how many corners he may cut, how close to the line he may play, without running into trouble with the law." *General Motors Corp. v. City of New York*, 501 F.2d 639, 649 (2nd Cir. 1974) (quoting O. W. Holmes, *The Path of the Law*, in Collected Legal Papers 170 (1920)). Rather, "it is drawn for the 'good man' as a beacon to assist him in navigating an ethical course through the sometimes murky waters of professional conduct." *Id.* Because an attorney's ethical obligation may often be uncertain, reliance on the good faith of an individual attorney in all its human frailty provides an inadequate safeguard against improper behavior, both actual and imagined.

> Even the most rigorous self-discipline might not prevent a lawyer from unconsciously using or manipulating a confidence acquired in the earlier representation and transforming it into a telling advantage in the subsequent litigation. Or, out of an excess of good faith, a lawyer might bend too far in the opposite direction, refraining from seizing a legitimate opportunity for fear that such a tactic might give rise to an appearance of impropriety. In neither event would the litigant's or the public's interest be well served. The dynamics of litigation are far too subtle, the attorney's role in that process is far too critical, and the public's interest in the outcome is far too great to leave room for even the slightest doubt concerning the ethical propriety of a lawyer's representation in a given case. These considerations require application of a strict prophylactic rule to prevent any possibility, however slight, that confidential information received from a client during a previous relationship may subsequently be used to the client's disadvantage. [*Emle Industries Inc. v. Patentex, Inc.*, 478 F.2d 562, 571 (2nd Cir. 1973).]

When dealing with ethical problems and applying such prophylactic rules, it is apparent that we cannot paint with broad strokes. The conclusion in a particular case can be reached only after "painstaking analysis of the facts and precise application of precedent." *United States v. Standard Oil Co.*, 136 F.Supp. 345, 367 (S.D.N.Y.1955).

Motors and the trial court properly refused to accept any of Patton's proposed submissions.

Without implying any reflection on Patton's integrity, we conclude that such attempts as were made here run the risk of being looked upon as efforts to manipulate litigation. As such they compromise in appearance if not in fact an attorney's duty to his client and cannot be countenanced.

■ The prophylactic rules to be applied where, as here, an attorney is charged with representing an interest adverse to his former client are *DR* 4–101 and *DR* 9–101. *DR* 4–101 prohibits an attorney from revealing the secrets and confidences of his clients. *DR* 9–101 cautions an attorney to avoid "even the appearance of professional impropriety." These disciplinary rules have become operative in this jurisdiction by incorporation into the New Jersey Court rules. *R.* 1:14. Adherence to these precepts by members of the New Jersey bar is thus mandatory. *See also Preliminary Statement, ABA Code of Professional Responsibility* (1978 ed.).

The ethical obligation of every attorney to preserve the confidences and secrets of a client is basic to the legitimate practice of law. Such an obligation is necessary for several reasons. Persons who seek legal advice must be assured that the secrets and confidences they repose with their attorney will remain with their attorney, and their attorney alone. Preserving the sanctity of confidentiality of a client's disclosures to his attorney will encourage an open atmosphere of trust, thus enabling the attorney to do the best job he can for the client. Note, "Attorney's Conflict of Interests: Representation of Interest Adverse to That of Former Client." 55 *B.U.L.Rev.* 61, 64 (1975). Wedded to the principle of confidentiality is the caveat of avoiding appearances of impropriety. The public display of an attorney representing conflicting interests, regardless of the attorney's good faith, may prevent the prospective client from completely confiding in his attorney. *Id.* It likewise would tend to erode the public's confidence in the bar.

■ It is clear that an attorney may not appear against a former client in the same litigation in which he has previously provided representation. *State v. Rizzo,* 69 *N.J.* 28 (1975); *In re Cipriano,* 68 *N.J.* 398 (1975); *In re Kushinsky,* 53 *N.J.* 1 (1968); *In re Braun,* 49 *N.J.* 16 (1967); *In re Blatt,* 42 *N.J.* 522 (1964); *In re Kamp,* 40 *N.J.* 588 (1963). *See also Perillo v. Advisory Committee on Professional Ethics,* 83 *N.J.* 393 (1980). If one attorney in a firm is disqualified, the entire firm is precluded from representing the client in that suit. *Laskey Bros. of W.*

*Va., Inc. v. Warner Bros. Pictures, Inc.*, 224 *F*.2d 824, 826 (2nd Cir. 1955), *cert.* den., 350 *U.S.* 932, 76 *S.Ct.* 300, 100 *L.Ed.* 814 (1956); *American Can Co. v. Citrus Feed Co.*, 436 *F*.2d 1125, 1128–29 (5th Cir. 1971); *State v. Rizzo, supra,* 69 *N.J.* at 30; *DR* 5–105(D); N.J. Advisory Comm. on Professional Ethics, Opinion No. 43 (1964) [hereinafter cited as Formal Opinion No.]; Formal Opinion No. 413 (1978). If there be any doubt as to the propriety of an attorney's representation of a client, such doubt must be resolved in favor of disqualification. *International Business Machines Corp. v. Levin*, 579 *F*.2d 271, 283 (3rd Cir. 1978); *Hull v. Celanese Corp.*, 513 *F*.2d 568, 571 (2nd Cir. 1975); *Chugach Elec. Ass'n v. United States Dist. Ct.*, 370 *F*.2d 441, 444 (9th Cir. 1966), *cert.* den., *sub nom. Roderick v. Chugach Electric Ass'n,* 389 *U.S.* 820, 88 *S.Ct.* 40, 19 *L.Ed.*2d 71 (1967).

### III

The issue before us today takes the problem of representation one step beyond an attorney's appearing in opposition to a former client in the same litigation. Here the question is whether the attorney may represent an interest in *new* litigation adverse to the same or substantially similar interest of his former client. Although the issue is a novel one in this state, it has been thoroughly examined in other jurisdictions. *See, e. g., General Electric Co. v. Valeron,* 608 *F*.2d 265 (6th Cir. 1979), *cert.* den., 445 *U.S.* 930, 100 *S.Ct.* 1318, 63 *L.Ed.*2d 763 (1980); *Arkansas v. Dean Foods Products Co., Inc.,* 605 *F*.2d 380 (8th Cir. 1979); *Westinghouse Electric Corp. v. Kerr-McGee Corp.,* 580 *F*.2d 1311 (7th Cir.), *cert.* den., 439 *U.S.* 955, 99 *S.Ct.* 353, 58 *L.Ed.*2d 346 (1978); *Government of India v. Cook Industries Inc.,* 569 *F*.2d 737 (2nd Cir. 1978); *Gas-A-Tron v. Union Oil Co.,* 534 *F*.2d 1322 (9th Cir.), *cert.* den., *sub nom. Shell Oil Co. v. Gas-A-Tron.,* 429 *U.S.* 861, 97 *S.Ct.* 164, 50 *L.Ed.*2d 139 (1976); *Richardson v. Hamilton International Corp.,* 469 *F*.2d 1382 (3rd Cir. 1972), *cert.* den., 411 *U.S.* 986, 93 *S.Ct.* 2271, 36 *L.Ed.*2d 964 (1973); *American Can Co. v. Citrus Feed Co., supra. See also* Discussion Draft of ABA Model Rules of Professional Conduct *R.* 1.10(a)(1), *R.* 7.1(b)(1), 48 *U.S.L.W.* No. 32 (February 19, 1980).

These courts have developed and utilized a "substantial relationship" test to effectuate the purposes and principles embodied in the ethical rules governing attorney behavior. This universally adopted standard, first articulated in *T.C. Theatre Corp. v. Warner Bros. Pictures, Inc.*, 113 *F.Supp.* 265 (S.D.N.Y.1953), was accepted by the trial court herein:

> [T]he former client need show no more than that the matters embraced within the pending suit wherein his former attorney appears on behalf of his adversary are substantially related to the matters or cause of action wherein the attorney previously represented him, the former client. The Court will assume that during the course of the former representation confidences were disclosed to the attorney bearing on the subject matter of the representation. It will not inquire into their nature and extent. Only in this manner can the lawyer's duty of absolute fidelity be enforced and the spirit of the rule relating to privileged communications be maintained. [163 *N.J.Super.* at 534, quoting *T.C. Theatre*, 113 *F.Supp.* at 268–69.]

*T.C. Theatre* involved a motion by defendant Universal Pictures to disqualify plaintiff's counsel. Less than a year earlier plaintiff's attorney, Thomas Cooke, had represented Universal in the so-called "Paramount case." His present client was suing Universal for violations of the Sherman Anti-Trust Act. 113 *F.Supp.* at 266–68. The court found that Cooke's representation in the present instance was in violation of the Canons of Professional Ethics because both the Paramount case and the subject litigation concerned substantially related matters. *Id.* at 268–69.

In general, a substantial relationship between matters will exist where the "adversity between the interests of the attorney's former and present clients * * * has created a climate for disclosure of relevant confidential information." Note, *supra*, 55 *B.U.L.Rev.* at 73. Disqualification is mandated where the issues between the former and present suits are practically the same or where there is a "patently clear" relationship between them. *See, e. g., Government of India v. Cook Industries, Inc., supra.* However, the lack of identity between the cases will not pose a barrier to disqualification when grounds sufficient to show an appearance of impropriety are present. *Emle Industries, Inc. v. Patentex, Inc., supra.* For example, in *Motor Mart Inc. v. Saab Motors Inc.*, 359 *F.Supp.*

156 (S.D.N.Y.1973), plaintiff's attorney was disqualified despite the absence of a showing of "identity" of issues and a twelve year hiatus between the allegedly conflicting representation. The prior representation made possible his exposure to business methods and confidential information, giving rise in the present action to an appearance of conflict of interest. Even if his relationship with Saab Motors was relatively small and even if the prior action did not raise issues identical to those involved herein, his past activities raise a shadow over his present involvement. [*Id.* at 158.]

This result is dictated by the proscription of *DR* 9–101 against maintaining even the appearance of impropriety. The appearance of impropriety is not governed by the refined perceptions of those schooled in the art of professional advocacy. While the disciplinary rule in question does not require proof of actual wrongdoing, there must be at least a reasonable perception of some impropriety. *See In re Cipriano, supra,* 68 *N.J.* at 403 ("To maintain public confidence in the bar it is necessary that the appearance of, as well as actual, wrongdoing be avoided."); *State v. Galati,* 64 *N.J.* 572, 576 (1974). The likelihood of public suspicion or obloquy should outweigh the social interests served by an attorney's continued participation in a particular case. *See Woods v. Covington County Bank,* 537 *F.*2d 804, 813 (5th Cir. 1976).

Where such substantially related matters are present or when a reasonable perception of impropriety exists, the court will assume that confidential information has passed between attorney and former client, notwithstanding the attorney's declarations to the contrary. The presumption of access to and knowledge of confidences may not be rebutted. *See e. g., Government of India v. Cook Industries, Inc., supra.* To permit an attorney to negate the inference would require the revelation of secrets and information which it is the purpose of the Canons to protect. *See United States v. Standard Oil Co., supra; T.C. Theatre Corp. v. Warner Bros. Pictures, Inc., supra.* Furthermore, the Canons seek to guard against the unconscious as well as the conscious use of information gained during the attorney-client relationship. *Id.,* at 269.

In summary, when a motion to disqualify an attorney is instituted by his former client to enforce the principles that an attorney must protect the confidences of a client and avoid even the appearance of impropriety, the former client must establish the following:

(1) a prior attorney-client relationship between the former client and the attorney sought to be disqualified;

(2) a substantial relationship or a reasonable perception, from the public's perspective, of a substantial relationship between the subject matter of the present suit and that of cases worked on during the former representation;

(3) access to relevant confidences of the former client, which may be proven by other than direct evidence, leading to a conclusive presumption of the attorney's knowledge of such confidences.

*See, e. g., Westinghouse Elec. Corp. v. Gulf Oil Corp.*, 588 F.2d 221, 225 (7th Cir. 1978).

## IV

Applying these principles, it becomes unmistakably clear that Patton must be disqualified from representing plaintiffs in this product liability action against his former client. There is no dispute that at one time Patton maintained an attorney-client relationship with General Motors. However, Patton now challenges the scope of that relationship and asserts that because of his associate status in a large, departmentalized corporate law firm he acquired no secrets or confidences from the corporate client.

With regard to ethical questions such as the one projected by this case the status of attorneys in a law firm is not a pivotal factor. A very junior associate or even a law student working part-time may enjoy a far greater access to the secrets and confidences found in a particular client's file than does the senior partner of a firm. Conversely, the young attorney who spends his working day in the library researching isolated issues of law may have no access to the client's secrets and confidences as compared to the partner who consults regularly with the client. In short, one's status is not necessarily related to the exposure one has to the client's confidences. Labels such as partner, associate, clerk, co-counsel should not control the outcome of decisions in this sensitive area. *See, e. g., Fund of*

*Funds, Ltd. v. Arthur Andersen & Co.*, 567 *F.*2d 225, 235 (2nd Cir. 1977).

We recognize the problems Patton raises here: the mobility of young attorneys and what they sometimes look upon as their serf-like status in corporate law firms. We also acknowledge the absurdity of the assertion that immediately upon their entry into a large law firm, associates "become the recipients of knowledge as to the names of all the firm's clients, the contents of all files relating to such clients, and all confidential disclosures by client officers or employees to any lawyer in the firm." *Silver Chrysler Plymouth Inc. v. Chrysler Motor Corp.*, 518 *F.*2d 751, 753–54 (2nd Cir. 1975), overruled on other grounds, *Armstrong v. McAlpin*, 625 *F.*2d 433 (2nd Cir. 1980). However, problems of the job market and mobility are not solved by loosening ethical standards required of the profession. The rules of professional behavior are not branches which bend and sway in the winds of the job market and changes in the size and location of law firms. Rather, the rules must be the bedrock of professional conduct.

Here, the substantial relationship test is clearly satisfied. The striking similarity between the present litigation and the prior cases of Krieger and Morgan make apparent both the legal and factual relationship of issues. As the trial court correctly observed, "For all practical purposes they are identical." 163 *N.J.Super.* at 537. Further Patton's ten years of extensive involvement in the defense of General Motors product liability claims would inevitably create a strong perception on the part of the public of knowledge of confidences.

The affidavit of Patton's associate, Paul Jackson, lends support to the conclusion that Patton did have access to and knowledge of General Motors' secrets. Patton was well aware of the methods of defense strategy which would be employed by General Motors, and on the basis of that knowledge he was able to convince Jackson that General Motors should be named as a defendant in the suit.

Patton asserts that the information it is claimed he had access to as an associate with the Carpenter firm is publicly available through other channels. This defense has repeatedly been found to be without merit, as the Canons seek to protect against the unconscious, as well as conscious, use of information gained during the attorney-client relationship. *Emle Industries v. Patentex, Inc., supra,* 478 *F.2d* 572–73; *Fleischer v. A.A.P. Inc.,* 163 *F.Supp.* 548, 551 (S.D.N.Y.1958) appeal dism'd., 264 *F.2d* 515 (2nd Cir.), *cert.* den., 359 *U.S.* 1002, 79 *S.Ct.* 1139, 3 *L.Ed.2d* 1030 (1959). Furthermore, no amount of discovery would be likely to uncover such useful information as the strengths and weaknesses of this corporate client's decision-makers or their attitude towards settlement.

Patton further urges that the 24 month period between his tenure at the Carpenter firm and the filing of the present law suit has served to dissolve his relationship with his former client. We cannot accept this assertion given the overwhelming substantial relationship between the issues here. However, there may be a point where the passage of time so dilutes the significance of the confidences that the Canons ought to have no impact on the situation. For instance, in product liability cases such as this, changes in technology would be a highly relevant— perhaps even determinative—factor.

The disqualification here extends to Patton's law firm as well. This result is dictated by *DR5*–105(D) as well as by case law. *See, e. g., Arkansas v. Dean Foods Products Co.; Inc., supra; State v. Rizzo, supra.* As the *Dean Foods Products* court observed:

> Clients who retain, are billed by, and pay a law firm, can reasonably expect and often their problems require, that confidences disclosed to one lawyer in the firm will be shared with others in the firm. Indeed, the ability to bring various fields of expertise to bear on the client's problem often serves as a justification for practice as a firm and the very reason for the client's decision to retain the firm. If the reputation and status of the legal profession, and more importantly the freedom and opportunity of the public to obtain adequate legal counselling, are to be preserved, a client must have every reason to expect that disclosures to "his" law firm will not be used against him by any member or associate lawyer in that firm. [605 *F.2d* at 385–86.]

 The fact that the plaintiffs here consent to Patton's continued representation of them in the face of his conflict of interest is not controlling. As we have noted before, although persons are entitled to retain qualified counsel of their own choice, there is no right to demand to be represented by an attorney disqualified because of an ethical requirement. *State v. Lucarello*, 135 *N.J.Super.* 347 (App.Div.), aff'd. o.b., 69 *N.J.* 31 (1975). Further, our duty to ferret out and discourage unethical behavior is owed to the general public as well as to the parties here.

 Nothing in today's decision should be understood as diluting the standards announced by us for the corresponding factual setting where a former government attorney is involved. *In re Advisory Opinion No. 361*, 77 *N.J.* 199 (1978). Although there can of course be no distinction made in the general application of the Canons of Professional Responsibility to members of the legal profession, certain special policy considerations dictate the use of different rules where representation of an interest adverse to a former client is involved. First, the former client of the former government attorney is the state itself. A narrow view of the state's status as a client is thus necessary to allow the former government attorney to practice law at all.[2] Second, a broad approach to disqualification of former government attorneys would adversely affect the ability of government to recruit young professionals and would interfere with the right of litigants to obtain counsel. *Id.* at 207.

Such important policy concerns are not present in conflict-of-interest situations which do not involve former government attorneys. Here the predominant policy consideration is to guard against the dangers incident to conflicts of interest and the appearance of impropriety affecting public confidence in the

---

[2]The fact that two different rules are required becomes clear when one examines hypothetical fact patterns. Under the rule we announce today, a former county prosecutor who was responsible for murder prosecutions could be precluded from representing defendants charged with substantially related offenses—namely, all homicide cases. This would be an absurd and unwarranted result.

bar. *See Perillo v. Advisory Committee on Professional Ethics,
supra; In re Advisory Opinion No. 361, supra,* 77 *N.J.* at 207.
As we noted in *In re Cipriano, supra,* "Integrity is the very
breath of justice," (quoting *Erwin M. Jennings Co. v. DiGenova,*
107 *Conn.* 491, 499, 141 *A.* 866, 868 (1928)) 68 *N.J.* at 404.

For the above reasons, the ruling of the trial court is affirmed
in all respects. Attorney Patton and the members of his law
firm are disqualified from representing these plaintiffs. The
trial court made the following order, which we likewise affirm:

> Because of the nature of the disqualification, it would be inappropriate for any
> of Patton's work product to be available for use against GM. I will therefore
> order that Patton and his firm furnish plaintiffs with a blank substitution of
> attorney and that plaintiffs' new attorneys shall be provided only with the
> pleadings and such discovery and correspondence as is required to understand
> the status of the case but does not disclose the strategy, plans or work product of
> Patton and his firm. In order that plaintiffs will not be harmed by the delay
> engendered by this proceeding and this ruling, I will entertain from new counsel
> such protective orders as may be necessary to extend the discovery period and if
> necessary to insure new counsel is not faced with an unduly early trial date.
> [163 *N.J.Super.* at 541 (footnote omitted).]

Affirmed. No costs.

*For affirmance* —Chief Justice WILENTZ and Justices SUL-
LIVAN, PASHMAN, CLIFFORD, SCHREIBER, HANDLER
and POLLOCK—7.

*For reversal* —None.