**HOME CARE INDUSTRIES, INC., and VBI Partners, L.L.C., Plaintiffs,**

**v.**

**John J. MURRAY, Defendant.**

**No. Civ.A. 00–3305.**

United States District Court,
D. New Jersey.

April 17, 2001.

Robert J. Del Tufo, Skadden, Arps, Slate, Meahger & Flom LLP, A New York Limited Liability Partnership, Jerrold Jay Wohlgemuth, Sills Cummis Radin Tischman Epstein & Gross, Newark, NJ, for Plaintiffs.

Philip W. Crawford, Gibbons, Del Deo, Dolan, Griffinger & Vecchione, PC, Newark, NJ, for Defendant.

## OPINION

WIGENTON, United States Magistrate Judge.

Before the Court is Defendant John Murray's Motion to disqualify Skadden, Arps, Slate, Meagher & Flom, L.L.P. from representing Plaintiffs Home Care Industries, Inc. and VBI Partners, L.L.P. in the pending matter, pursuant to Rules of Professional Conduct 1.7(c), 1.9(a)(1) and 1.13(d). Said Motion is hereby granted.

## *BACKGROUND*

Plaintiffs Home Care Industries, Inc. ("HCI") and VBI Partners, L.L.C. ("VBI") filed a Complaint against Defendant John Murray on July 7, 2000, in which they seek a declaratory judgment pursuant to 28 U.S.C. § 2201, the Declaratory Judgments Act. (Compl.¶ 3). Plaintiffs allege the following events took place. On or about November 18, 1999, HCI and Murray entered into an employment agreement. (*Id.* ¶ 5, Answer and Counterclaim, Ex. A). Under the terms of said agreement, Defendant agreed to assume the duties of President, Chief Executive Officer ("CEO") and member of the Board of Directors of HCI, effective as of the date of the agreement. (*Id.* ¶ 5). On such day, Plaintiffs and Defendant entered into compensatory stock agreements as well. (*Id.* ¶ 7–12).

On or about January 8, 2000, Murray and Harvey Mallement, a Director of HCI, held a meeting to discuss "Murray's performance as Chief Executive Officer during which both agreed that it would be in everyone's interest to end the relationship." (*Id.* ¶ 13). During such meeting, Murray resigned voluntarily as CEO, and in consideration of Murray's resignation and on behalf of HCI, Mallement offered Murray severance pay and a stock purchase package as a settlement. (*Id.* ¶ 14). Murray accepted Mallement's settlement offer. (*Id.*). Despite Murray's voluntary resignation, and Mallement's extension of a settlement offer, HCI had sufficient grounds upon which to terminate him for 'cause' as that term is defined in their employment agreement. (*Id.* ¶ 15).

Plaintiffs assert that, "[i]n the short time that Murray was employed at Home Care, he alienated Home Care's directors, executives and factory employees, and failed to perform material duties despite having been given specific instructions by the Board of Directors (the "Board"), so as to constitute cause for termination of his employment." (*Id.* ¶ 16). Particularly, "on December 15, 1999, Murray caused an altercation with Steven Bosses ("Bosses"), one of the original owners of Home Care

who stayed and worked at the Company pursuant to a three-year employment agreement. Murray physically blocked Bosses' exit from the office building while engaging him in a shouting match." (*Id.* ¶ 17). Bosses did not return to work the following day, and at a meeting of the Board, Murray stated that he wanted to stop paying Bosses payments that were required under Bosses' employment agreement. (*Id.*). The Board directed Murray to continue Bosses' payments, but Murray instead stopped payments to Bosses. (*Id.*). As a result, Bosses retained counsel for what might have developed into a lawsuit, the very action the Board sought to avoid. (*Id.*).

In December 1999, employees of HCI learned that Murray intended to change sick leave and vacation policies, without authority from the Board. (*Id.* ¶ 19). Twenty-four employees who worked on the floor of the HCI factory signed a petition in protest of the reduction of their benefits. (*Id.*). Despite their petition and without the Board's approval, Murray changed sick leave and vacation policies. (*Id.* ¶ 20). As a result, the Vice President of Sales resigned from employment, although HCI Directors convinced him to return to work. (*Id.*). HCI "Directors were concerned that key officers of Home Care were unhappy because of ill-conceived and poorly executed management decisions made by Murray in his short tenure with Home Care." (*Id.* ¶ 21). Plaintiffs were concerned "that Murray, in making business judgments for reducing costs, was placing his personal interests above those of the Company [HCI] and the shareholders." (*Id.* ¶ 22).

On or about January 5, 2000, Murray made demands of HCI's Chairman of the Board and a HCI Board member outside of the terms of the employment agreement. (*Id.* ¶ 23). On January 8, 2000, the Board asked Mallement to speak with Murray. (*Id.* ¶ 25). During that conversation, Murray resigned voluntarily and accepted Mallement's settlement offer. (*Id.*). Plaintiffs contend that the settlement represented a compromise whereby Murray would not be discharged 'for cause,' would resign voluntarily and would receive substantial benefits. (*Id.* ¶ 27). The parties disagree as to the validity and enforceability of the settlement, and alternatively, to the conclusion that Murray could have been, and could or should now be deemed to have been, terminated for cause. (*Id.* ¶ 28). Thus, Plaintiffs seek a declaratory judgment to determine and declare the rights, obligations and liabilities that exist between the parties. (*Id.* ¶ 29).

On August 18, 2000, Murray filed a Motion to disqualify Plaintiffs' counsel, Skadden, Arps, Slate, Meagher & Flom, L.L.P. ("Skadden Firm"), from representing Plaintiffs in this matter pursuant to R.P.C. 1.7(c) and 1.9(a)(1). Murray contends that the Skadden Firm counseled him with regard to the alleged Steven Bosses incident and the sick leave and vacation policies disputes while he was employed at HCI. (Murray Aff. ¶ 9). Murray argues that "[he] did enter into an attorney/ client relationship with the Skadden Firm regarding these and other legal matters." (*Id.* ¶ 10). Specifically, Murray received correspondence dated December 16, 1999, from Muchnick, Golieb & Golieb, P.C. ("Muchnick Firm"), in which that firm indicated that it was representing Steven, Mark and Martin Bosses with regard to Murray's alleged altercation with Steven Bosses and the sick leave and vacation policies disputes. (*Id.* ¶¶ 11 and 12, Ex. B). Further, Murray received correspondence dated December 20, 1999, from the Muchnick Firm related to the alleged incident involving Steven Bosses. (Murray Aff. ¶ 13, Ex. C). "As a result of receiving those correspondence from the Muchnick

Firm, [Murray] contacted the Skadden Firm in order to obtain their representation against the Muchnick Firm as to all issues." (Murray Aff. ¶ 14). Murray offers that during December, 1999, "the Skadden Firm counseled [him] regarding i) the alleged incident involving Steven Bosses; and ii)[his] cessation of HCI management's abuse of certain sick pay and vacation time privileges." (*Id.* ¶ 15). In fact, the Skadden Firm sent to the Muchnick Firm correspondence dated December 20, 1999, in response to the Muchnick Firm's correspondence dated December 16 and 20, 1999, in which the Skadden Firm represents that "[i]ndependent witnesses have confirmed that Mr. Bosses' version of those events is not accurate. He has been treated respectfully and with courtesy by Jack [Murray]. Any problems Mr. Bosses has with his employment are of his own making." (Smith December 20, 1999 Correspondence). Murray discloses that during December 1999, the Skadden Firm conducted a confidential interview with him regarding the alleged Bosses incident, the sick pay and vacation time matters, under what Murray understood to be attorney/ client privilege. (Murray Aff. ¶¶ 17 and 23). Further, during December 1999, the Skadden Firm conducted witness interviews on Murray's behalf with regard to the Bosses incident and Steven Bosses' employment in general. (*Id.* ¶ 18). During that time, the Skadden Firm advised and consulted with Murray regarding his future dealings with Steven Bosses and the appropriateness of the sick pay and vacation time matters. (*Id.* ¶¶ 19 and 24). "At all relevant times, [Murray] understood that the Skadden Firm was acting as [his] counsel on the Steven Bosses matter. This is especially true in light of the Muchnick Firm's reference to "physical" abuse and the individual liability that such claims posed." (*Id.* ¶ 20. See *Id.* ¶¶ 25 and 27). Murray argues that, "[a]t no time did the Skadden Firm indicate that the attorney/ client relationship was lacking." (*Id.* ¶¶ 21 and 26). Murray contends that the Skadden Firm represented to him and the Muchnick Firm, by virtue of the Skadden Firm's December 20, 1999 correspondence, that it was acting on behalf of Murray and in his interests as they related to the Bosses incident and the sick pay matter. (*Id.* ¶¶ 22 and 26). Further, the Skadden Firm *never communicated to* Murray that HCI's position on the Bosses incident and sick pay matter was different from Murray's. (*Id.* ¶ 27). Murray contends that, "[the Skadden Firm's] conduct, at all times, manifested their representation of my interests." (*Id.*).

In the Motion to disqualify the Skadden Firm from representing Plaintiffs, Murray contends that R.P.C. 1.7(c) and 1.9(a)(1) require such disqualification. (Br. in Support of Motion to Disqualify Pls' Counsel). Specifically, Murray argues that the Skadden Firm represented him previously; Plaintiffs' interests are adverse materially to Murray's; the Skadden Firm's representation of Plaintiffs in the instant matter is substantially related to its former representation of Murray and the ordinary citizen would perceive the appearance of impropriety. (*Id.*).

On September 11, 1999, Plaintiffs submitted opposition to the Motion to disqualify the Skadden Firm from representing Plaintiffs. Plaintiffs contend that there is no conflict of interest under R.P.C. 1.9 nor an appearance of impropriety under R.P.C. 1.7. (Pls' Br. in Opp.). To that end, Plaintiffs argue that Murray was not a client of the Skadden Firm in the previous matter that such firm handled on behalf of Plaintiffs, and there was no attorney/ client relationship, express or implied, between the Skadden Firm and Murray when he was President of HCI. (*Id.*). Further, Plaintiffs explain that the Skadden Firm

has served as Corporate Counsel for HCI since 1998. (Smith Certification ¶ 4). Benesch, Friedlander, Coplan & Aronoff ("Benesch Firm") represented Murray during employment negotiations with HCI, and such Firm represents Murray in the instant matter as well. (*Id.* ¶ 6).

Plaintiffs contend that, "[Murray's] employment, however, was not a success." (*Id.* ¶ 7). In addition to Murray's altercation with Steven Bosses, "the board learned of incidents involving Mr. Murray's poor judgment and refusal to follow the board's instructions." (*Id.* ¶ 9). Plaintiffs contend that interests between the parties diverged when Murray agreed to resign from HCI effective January 10, 2000. (*Id.* ¶¶ 9 and 10). "At all times prior, specifically with regard to the Steven Bosses incident and the termination of Steven Bosses' benefits, the interests of Mr. Murray and Home Care were the same." (*Id.* ¶ 10). Mark Smith, Esq., partner of the Skadden Firm and counsel for Plaintiffs, states that he had no obligation to advise Murray that his interests were adverse to HCI's during the period that the Skadden Firm was counseling HCI with regard to Steven Bosses' employment agreement. (*Id.* ¶ 11). Smith adds that, "[a]t no time during the course of Skadden Arps' representation of Home Care did [he] represent or counsel Murray in his personal capacity." (*Id.* ¶ 12). Rather, the Skadden Firm was acting as Corporate Counsel for HCI, which required communication with Murray, solely in his capacity as President of HCI. (*Id.* ¶ 13). Further, Smith contends that conferences, discussions and letters to third-parties, upon which Murray relies, were related solely to Murray's role as a corporate officer. (*Id.* ¶ 14). Smith explains that Murray never expressed to him any concern about personal liability with respect to actions he took or incidents he was involved with, in his capacity as Presi-

dent of HCI. (*Id.* ¶ 15). "In December 1999, [Smith] spoke to Murray only a couple of times, during which conversations we discussed a letter ("Bosses Letter") he received from an attorney representing Steven Bosses, concerning alleged material breaches by the Company of its obligations under [Bosses'] Employment Agreement." (Smith Aff. ¶ 16, quoting Murray Aff. ¶ 11). Contrary to Murray's assertions, Smith contends that the Skadden Firm did not conduct an investigation on Murray's behalf. (Smith Aff. ¶ 17). Rather, Smith argues that "[i]t is clear from the attorney demand letter that any inquiries related solely to Mr. Bosses' employment agreement." (*Id.*). Smith asked Murray about the allegations set forth in the Muchnick Firm's correspondence, which related to Steven Bosses, and he prepared a response to that Firm's correspondence on behalf of HCI, based on the information Murray provided to him in his capacity as President of HCI. (*Id.* ¶ 18). Further, contrary to Murray's contention, Smith asserts that the Skadden Firm never advised or consulted Murray with regard to his future dealings with Steven Bosses or Murray's unilateral decision to terminate cash payments for unused sick pay to HCI's rank-and-file employees. (*Id.* ¶¶ 19 and 20). Further, "[a]t no time did Skadden Arps represent to Mr. Murray or anyone else, or act in any way to suggest, that an attorney/ client relationship existed between Skadden Arps and Mr. Murray." (*Id.* ¶¶ 21 and 23). Smith asserts that the Skadden Firm did not conduct a confidential interview with Murray in December 1999 with regard to the sick pay and vacation time issues raised in the Muchnick Firm's correspondence. (*Id.* ¶ 22).

## DISCUSSION

██ Local Rule 6A of the United States District Court for the District of New Jer-

sey provides that the New Jersey Rules of Professional Conduct ("R.P.C.") govern the conduct of attorneys admitted to practice before the Court. *See Essex Chemical Corp. v. Hartford Accident and Indemnity Co.*, 993 F.Supp. 241, 245–46 (D.N.J. 1998) (citing L.Civ.R. 6A). To resolve a conflict that involves the R.P.C., a court may review decisions rendered by state and federal courts in New Jersey and other relevant authority. See *Id.* at 246.

## I. Rule of Professional Conduct 1.9

Under New Jersey law, the rule that involves disqualification of counsel is codified at R.P.C. 1.9. R.P.C. 1.9(a)(1) provides, in relevant part:

(a) A lawyer who has represented a client in a matter shall not thereafter:

(1) represent another client in the same or a substantially related matter in which that client's interests are materially adverse to the interests of the former client unless the former client consents after a full disclosure of the circumstances and consultation with the former client; or

(2) use information relating to the representation to the disadvantage of the former client except as RPC 1.6 would permit with respect to a client or when the information has become generally known.

(B) The provisions of RPC 1.7(c) are applicable as well to situations covered by this rule.

R.P.C. 1.9.

■ The New Jersey Supreme Court has adopted the "substantial relationship" test to determine whether disqualification is warranted under R.P.C. 1.9(a)(1). See *Id.* at 246. Under that test, as applied to reflect R.P.C. 1.9, a movant must prove: "(1) the existence of a past attorney-client relationship between the movant and the attorney sought to be disqualified; (2) that

the interests of the attorney's current client are materially adverse to those of the movant; and (3) the current representation involves the same or a matter substantially related to the former representation." *Id.* (citing *Host Marriott Corp. v. Fast Food Operators, Inc.*, 891 F.Supp. 1002, 1007 (D.N.J.1995)). See *Reardon v. Marlayne, Inc.*, 83 N.J. 460, 474, 416 A.2d 852 (1980) (Pursuant to R.P.C. 1.9(a)(1), the moving party has the burden to establish that disqualification is appropriate); *Ciba–Geigy Corp. v. Alza Corp.*, 795 F.Supp. 711, 714–15 (D.N.J.1992) (A court must dismiss counsel who represents a litigant in a matter before it when said counsel represented previously a party to the litigation in a matter that is substantially related to the current litigation. Additionally, said counsel must have represented the former client in a matter that is adverse to his or her current representation).

The Court in *Reardon* determined that a substantial relationship exists and "[d]isqualification is mandated where the issues between the former and present suits are practically the same or where there is a 'patently clear' relationship between them." *Reardon* at 472, 416 A.2d 852 (citing *Government of India v. Cook Industries, Inc.*, 569 F.2d 737 (2d Cir.1978)). Further, the Court applied the principles of R.P.C. 1.9(b) and held that disqualification would be appropriate, regardless of whether substantially related matters are present, where a reasonable perception of impropriety exists. *Reardon* at 472–73, 416 A.2d 852. In either such case, the court will irrebuttably presume that confidential information has passed between attorney and former client, and disqualification will be compelled, even if the attorney represents otherwise, in order to guard against the unconscious as well as the conscious use of information gained during the

attorney-client relationship. *Id.* at 473, 416 A.2d 852. (See *T.C. Theatre Corp. v. Warner Bros. Pictures*, 113 F.Supp. 265 (S.D.N.Y.1953)). This appearance of impropriety doctrine, codified in R.P.C. 1.9(b), incorporates by reference R.P.C. 1.7(c) as to successive representation problems. *Essex* at 253 (citing R.P.C. 1.9(b) and 1.7(c); *Carlyle Towers Condo. Ass'n v. Crossland Sav., FSB*, 944 F.Supp. 341, 352 (D.N.J.1996)).

> R.P.C. 1.7(c) provides, in relevant part:
>
> (1) in certain cases or categories of cases involving conflicts or apparent conflicts, consent to continued representation is immaterial, and
>
> (2) in certain cases or situations creating an appearance of impropriety rather than an actual conflict, multiple representation is not permissible, that is, in those situations in which an ordinary knowledgeable citizen acquainted with the facts would conclude that the multiple representation poses substantial risk of disservice to either the public interest or the interest of one of the clients.

R.P.C. 1.7(c). Courts in New Jersey have held consistently that the appearance of impropriety doctrine is intended to "bolster the public's confidence in the integrity of the legal profession." *Id.* at 253 (quoting *Steel v. General Motors Corp.*, 912 F.Supp. 724, 740 (D.N.J.1995)) (quoting *In re Advisory Opinion on Prof. Ethics No. 569*, 103 N.J. 325, 330, 511 A.2d 119 (1986)).

The Court in *Host Marriott Corp. v. Fast Food Operators, Inc.*, 891 F.Supp. 1002, 1009 (D.N.J.1995), explained:

> Disqualification under the appearance of impropriety doctrine is "not required unless 'an ordinary knowledgeable citizen acquainted with the facts' could conclude that there was a representation within the scope of RPC 1.9 and that

continued representation would pose a 'substantial risk of disservice to either the public interest or the interest of one of the clients.' RPC 1.7(c)(2)." *Bagdan v. Beck*, 140 F.R.D. 660, 670 (D.N.J. 1991). Moreover, "the appearance of impropriety must be something more than a fanciful possibility. It must have a reasonable basis." *Higgins v. Advisory Committee on Professional Ethics*, 73 N.J. 123, 129, 373 A.2d 372 (1977).

Although R.P.C. 1.9, by attempting to prevent even the potential that a former client's confidences and secrets be used against him, is intended to promote a client's confidence in its counsel and the public's confidence in the integrity of the bar, *In re Corn Derivatives Antitrust Litigation*, 748 F.2d 157, 162 (3d Cir.1984), the Third Circuit has recognized that relevant countervailing considerations may exist and has employed a balancing test to determine whether disqualification of counsel is warranted. *Id.* (citing *United States v. Miller*, 624 F.2d 1198, 1201 (3d Cir.1980)). For example, in a complex litigation matter, a court should consider whether disqualification of counsel would increase the time and expense involved in litigation as new counsel must work to familiarize adequately herself with the factual and legal issues presented in the matter. *Id.* Alternatively, a court should consider whether counsel may use information it obtained while representing a former client against such client in a subsequent matter. *Id.* Thus, a court must analyze painstakingly the facts presented in the matter before it to determine whether to disqualify counsel.

## II. Rule of Professional Conduct 1.13(d)

R.P.C. 1.13(d) provides guidance to counsel in dealing with directors and officers of a corporation, partnership or

business entity [1]. R.P.C. 1.13(d) provides, in relevant part:

> (d) In dealing with an organization's directors, officers, employees, members, shareholders or other constituents, a lawyer shall explain the identity of the client when the lawyer believes that such explanation is necessary to avoid misunderstanding on their part.

R.P.C. 1.13(d). As set forth by the Court in *Schiffli Embroidery Workers Pension Fund v. Ryan, Beck & Co.,* 1994 WL 62124 (1994),

> [A] professional relationship between attorney and client "need not be articulated, in writing or speech but may, under certain circumstances, be inferred from the conduct of the parties." *In re Palmieri,* 76 N.J. 51, 58–59, 385 A.2d 856 (1978). See also *In re Makowski,* 73 N.J. 265, 268–69, 374 A.2d 458 (1977) ("whether or not a fee is paid, one who assumes to give legal advice takes on the role of an attorney").

1994 WL 62124 at *3, 1994 U.S.Dist. LEXIS 2154 at * 8. The Court held that R.P.C. 1.13,

> "establishes a guideline of fairness for functioning with a legal fiction. When it becomes apparent that the interests of the [entity] and some of its constituents are no longer aligned and *may* even become adverse, the attorney *must* fairly inform the constituent that his only client is the [entity]."

(Emphasis added) *Schiffli,* 1994 WL 62124 at * 3–4, (quoting *Professional Serv. Indus. v. Kimbrell,* 758 F.Supp. 676, 683 (D.Kan.1991)) (applying Kansas R.P.C. 1.13, which is identical to N.J. R.P.C. 1.13).

The Court determined that, "[the law firm] failed to take the precaution of advising [movant] that he might need to procure separate legal counsel. Given this failure, and the reasonableness of [movant's] belief, the Court concludes that [the law firm] and [movant] had formed an attorney-client relationship." *Schiffli* 1994 WL 62124 at * 4. Further, the Court ruled that:

> When representing a corporation or legal fiction, contact with its fiduciaries or other constituents is not only inevitable, but it is essential to effective legal representation of the client. However, attorneys must tread carefully. Today, the constituent might be the source of vital information as a representative of the client. Tomorrow, however, that same constituent might be a defendant in a lawsuit by the client. The lawyer has the responsibility of preempting the formation of an attorney-client relationship with the constituent where such a relationship is not intended.

*Schiffli* 1994 WL 62124 at *4–5.

### III. Application of Law to the Facts of the Instant Matter

■ Applying these principles to the instant matter, the Court finds that, pursuant to the Rules of Professional Conduct, the Skadden Firm must be disqualified from representing Plaintiffs in this matter. Here, the "substantial relationship" test is satisfied. An examination of the totality of the circumstances reveals that the Skadden Firm and Murray shared an implied attorney-client relationship in December 1999. Murray sought the assistance of the Skadden Firm to defend him against allegations made by the Muchnick Firm. The Skadden Firm interviewed Murray and witnesses to the incidents addressed in the Muchnick Firm's correspondence dated

---

**1.** For purposes of R.P.C. 1.13, an "organization" may be defined as a corporation, partnership or business entity. See R.P.C. 1.13(f).

December 16 and 20, 1999. Further, the Skadden Firm consulted and advised Murray, and in the correspondence dated December 20, 1999, it defended Murray against said allegations. At least ostensibly, the Skadden Firm represented Murray in December 1999. The Skadden Firm presented to Murray and the Muchnick Firm a united front, and Murray's belief that the Skadden Firm represented him was reasonable given the conduct of the Skadden Firm.

Further, the Skadden Firm should have been alerted that Murray believed or could reasonably believe that said firm represented him personally particularly when said firm notes in the Opposition to the instant Motion that Murray habitually retains the Benesch Firm to represent him in legal matters. The Bosses made serious allegations against Murray, and Murray did not seek the Benesch Firm's assistance. The Court is persuaded that Murray did not seek assistance of the Benesch Firm or any outside counsel because he believed that the Skadden Firm represented him. The record is clear that the Skadden Firm failed to inform Murray that its client was HCI and not Murray. Further, the record does not contain a copy of the retainer agreement between Plaintiffs and the Skadden Firm. An explanation of the Skadden Firm's position as counsel for HCI exclusive of its officers, would have gone a long way to avoid the position that said firm finds itself defending in the instant matter. Given that the rapport between the Skadden Firm and Murray, by virtue of his position at HCI, was a delicate one, the Skadden Firm should have taken precautions to clarify any ambiguity concerning its duty to represent HCI as separate and distinct from its officers. This is true particularly because Steven Bosses could have sued Murray personally,[2] and an adverse relationship might have developed between HCI and Murray.

Further, the Skadden Firm should have been more cautious in its dealing with Murray given that Murray is not an attorney, unlike the officer who was an attorney in *Ferranti International plc v. Clark*, 767 F.Supp. 670 (E.D.Pa.1991), where the Court in that matter imputed knowledge of Corporate Counsel's loyalty to the corporation separate and distinct from its officers. See *Ferranti Int'l.* at 672 (This is not a case in which a layperson might have perceived or reasonably misperceived that his corporate employer's attorney was also representing him. As a general counsel, defendant [movant] must have keenly appreciated the distinction between the corporation and its employees as well as the employees' need for separate counsel; citing *Evans v. Artek Systems Corp.*, 715 F.2d 788, 792 (2d Cir.1983)). The Skadden Firm should have protected its position as Corporate Counsel for HCI and revealed its loyalty to HCI as the law firm did in *In the Matter of Bevill, Bresler & Schulman Asset Management Corp.*, 805 F.2d 120, 123 (3d Cir.1986) ( [W]e advised each individual official to retain separate and individual counsel). The Skadden Firm and Murray shared a close and active relationship with regard to the allegations presented by the Muchnick Firm. The Skadden Firm had access to all pertinent files and to Murray's thoughts and strategies regarding allegations made against him. The Skadden Firm fostered

---

**2.** The Muchnick Firm's correspondence dated December 16, 1999, states "[w]e further specifically preserve any and all other rights and remedies that Mr. Bosses may have against Home Care and/or its President by reason of these matters, whether arising pursuant to the terms of the Employment Agreement, by law or otherwise." Muchnick Correspondence dated December 16, 1999.

an environment whereby Murray would have confided comfortably in said firm. For these reasons, Murray's belief that the Skadden Firm represented him personally was reasonable. Importantly, if the Court permitted the Skadden Firm to represent Plaintiffs in this matter, an ordinary knowledgeable citizen, acquainted with the circumstances, would find that such successive representations pose a risk of disservice to Murray's legal position. Such perception of impropriety is aggravated where as here, Plaintiffs now switch sides and blame Murray for the Bosses incident and misconduct involving sick pay benefits, although Plaintiffs previously, through the Skadden Firm, defended Murray on these very issues. Such switching of sides smacks of the appearance of impropriety.

Further, HCI and VBI's interests are materially adverse to those of Murray. Plaintiffs seek to dissolve or limit rights Murray may have pursuant to his employment agreements, and Murray has countersued seeking benefits under said agreements.

Further, the Skadden Firm's representation of Plaintiffs in the instant matter is substantially related to its representation of Murray in December 1999. Plaintiffs seek to limit or dissolve completely Murray's rights under his employment agreements by demonstrating that Murray failed to conduct himself professionally and follow the Board's instructions. Clearly, both suits share a common core of facts, and the public would perceive a substantial relationship between them.

Finally, Plaintiffs would suffer no undue burden or hardship as a result of disqualification of the Skadden Firm. The facts and issues presented in this matter are straightforward and not complex, and the Motion to disqualify counsel was made early in the litigation and prior to a Local Rule 16 Conference.

For the foregoing reasons, Murray's Motion to disqualify the Skadden Firm from representing Plaintiffs in the instant matter is granted.